UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

JODY R. O. CARR,

    Plaintiff,

vs.

WAYNE TOUSLEY, et al.,

    Defendants.

NO. CV-06-0125-S-JLQ

**MEMORANDUM OPINION AND ORDER ON SUMMARY JUDGMENT MOTIONS**

    BEFORE THE COURT ARE the remaining Defendants' [Tousley, Wright, Buyers, Hughes, Shaffer, Shultz, Carlson, Stringer, Adams, and Guest] motions for summary judgment (Ct. Recs 108, 109, 110, 111, 112, 113, 114, 115), as well as Defendants' Motion to Strike Documents Submitted by Plaintiff in Support of His Opposition to Defendants' Motions for Summary Judgment (Ct. Rec. 158) and Defendants' Motion to Strike Affidavits Filed by Plaintiff (Ct. Rec. 159).

**I. BACKGROUND**

    Plaintiff Jody Carr, who was incarcerated on murder charges at the Twin Falls County Jail (TFCJ) at all times relevant to his Complaint, lodged a pro se civil rights complaint under 42 U.S.C. § 1983 on March 24, 2006. He is now housed at the Idaho State Penitentiary. After screening his 113-pg Complaint, the court dismissed numerous "noncognizable" claims, but permitted the Plaintiff to proceed *in forma pauperis* on certain claims, including a plethora of complaints regarding his conditions of confinement at the Jail. After the case was assigned to the undersigned, Plaintiff was required to amend his Complaint because its "rambling and disjointed" nature violated Fed.R.Civ. 8(a). Ct. Rec. 43. Plaintiff then filed the operative complaint here, the Amended Complaint (Ct. Rec. 48), which likewise lacked sufficient detail to discern

ORDER - 1

which claims pertained to which Defendant. The court ordered Plaintiff to supplement the Amended Complaint, directing him to organize his allegations by Defendant and chronologically set forth each allegation against each of them. Ct. Rec. 66.

The court previously dismissed all claims against Defendant Twin Falls County Jail and Defendant Gambrell.

*Plaintiff's Claims*

The operative complaint is Plaintiff's Verified Amended Version of Prisoner's Civil Right's Complaint for Declaratory Relief and Damages filed June 12, 2007 (Ct. Rec. 28) ("Amended Complaint"). The Amended Complaint sets forth an omnibus hodgepodge of allegations, that after ample time for discovery and to create a record, are supported by little more than Plaintiff's own assertions. Liberally construed, the court is able to segregate the claims in the Amended Complaint into the following categories:

    1. Claims concerning conditions of confinement

        a) cell lighting

        b) noise level

        c) cell temperature

        d) lack of winter clothing

        e) unsanitary conditions

        f) issues with food

        g) grievance system

        h) medical care

        I) cell assignments/classification

        j) time out of cell

        k) verbal harassment

    2. Claims for failure to protect from other inmates

    3. Claims regarding access to courts and counsel and being forced to plead guilty

    4. Claims regarding the right to privacy and deprivations of property

    5. Retaliation

ORDER - 2

6. Supervisory claims regarding policies and failure to train/supervise

The court will address each of these categories separately.

*Ferreting Out the Facts*

Defendants have moved for summary judgment on the grounds that Plaintiff has not stated valid § 1983 claims and that Defendants are entitled to qualified immunity. Because Plaintiff's claims are so varied and numerous, Defendants have filed separate motions regarding the case against each Defendant individually. With their motions, Defendants proffer a separate Statement of Facts (DSOF) (Ct. Rec. 116), which is supported by the affidavits of Defendant Virgil Adams, Senior Deputy at the TFCJ (Ct. Rec. 116, Ex. 2); Chris Bratt, TFCJ employee (Ex. 3); Defendant Michael Carlson (Ex. 4); Trish Christy, management assistant with the State of Idaho Peace Officer Standards and Training Academy (Ex. 5); Defendant Michael Guest, Sergeant at the TFCJ (Ex. 6); Charles Hoop, TFJC employee (Ex. 7); Jack Johnson, Twin Falls County Sheriff's office lieutenant (Ex. 8); Michael Kane (Ex. 9); Richard Kinyon, TFCJ sergeant (Ex. 10); Neil Schulz (Ex. 11); Defendant Stephanie Shaffer (Ex. 12); Susan Stringer (Ex. 13); the affidavit of Douglas Sudgen, TFCJ employee (Ex. 14); Nick Albers (Ct. Rec. 117); Defendant Steven Byers (Ct. Rec. 118);  Defendant Robert Wright (Ct. Rec. 119); Defendant Wayne Tousley (Ct. Rec. 120); Georgette Stevens, administrative assistant in the medical department of the Idaho Department of Corrections in Orofino (Ct. Rec. 121); Nick Perius, employee of the Magic Valley Regional Medical Center (Ct. Rec. 122); Judy Hepworth, TFCJ nurse (Ct. Rec. 123); and Douglas Hughes (Ct. Rec. 124). There are various exhibits submitted with the affidavits.

The court issued the required notice informing Plaintiff of his obligation to respond to the summary judgment motions (Ct. Rec. 126). In support of his opposition, Plaintiff submits (1) a single Memorandum opposing all the motions (Memorandum); (2) eight separate briefs in response to Defendants' memoranda on each of the motions; and (3) a single separate Statement of Disputed Facts (PSOF)(Ct. Rec. 144). The Memorandum contains legal authorities for Plaintiff's position. The Briefs are specific to

ORDER - 3

1  the particular motion and attack paragraph by paragraph the relevant affidavits the
2  Defendants offer in support of their motions.  However, in most instances rather than
3  stating specific facts in contravention, Plaintiff simply asks the court to review a laundry
4  list of exhibits referenced by number.

5      Similarly, Plaintiff's Statement of Disputed Facts is a blanket statement that
6  Plaintiff disputes all facts and he refers the court generally to all of the exhibits he has
7  provided the court in support of his position on summary judgment.  Plaintiff has
8  supplied the court with stacks of evidence in the form of documents, 28 affidavits of
9  different inmates, and 2 affidavits of his mother and step-father.  Plaintiff has not filed
10  his own affidavit, but relies upon his assertions in the Amended Complaint and the
11  Supplement.

12      At issue in this action is the effect of Plaintiff's failure in many instances to
13  provide support for the conclusory allegations in the Amended Complaint, even after
14  amendment of the Complaint, supplementation of the Complaint, and now in his
15  responses to summary judgment.  Many courts have local rules with strict requirements
16  regarding summary judgment motions which require litigants to file *separate* statement
17  of facts as well as a *response* to the movant's statement of material facts (admitting or
18  denying the facts with citation to the record).  Such rules are specifically designed to
19  avoid the procedural morass extant in the matter *sub judice*. The local rules of the
20  District of Idaho require the filing of a "statement of disputed facts."  Where Plaintiff's
21  statement of disputed facts is just a general denial of all facts stated by the Defendants
22  and Plaintiff has not filed his own statement of facts, the situation makes it extremely
23  difficult to identify the universe of actual, material, factual disputes, if any, and the legal
24  efficacy thereof.  The time required to decipher the filings in cases such as this creates
25  undue burdens on limited judicial resources that delay the courts' efforts to render
26  decisions in this case and others.

27      Plaintiff's response leaves the court with the cumbersome task of sifting through a
28  myriad of exhibits alleged to pertain to innumerable claims against a number of claimed

ORDER - 4

Defendants, many of which would not be sufficient to survive screening under 28 U.S.C. § 1915 or are foreclosed by governmental immunities.  In such a case, the mere possibility that a factual dispute may exist, without more, is not sufficient to overcome a convincing presentation by the moving party.  Sorting the wheat from the chaff has taken this court needless hours that could have been devoted to other matters.

## II.   FACTS

The following are the undisputed facts of this case, unless otherwise noted. Generally, Defendants dispute nearly all of Plaintiff's allegations in the Amended Complaint.  Defendants' proffered facts are mostly undisputed by Plaintiff.  Factual allegations that are not properly supported by the record are treated as nullities.

Plaintiff was incarcerated at the Twin Falls County Jail (hereinafter "Jail" or "TFCJ") as a pretrial detainee on murder charges. Plaintiff was housed at the TFCJ from February 14, 2004, until his transfer to the state penitentiary on October 27, 2005.  He alleges that during his incarceration he was subjected to inhumane or unconstitutional conditions that violated his civil rights.   Plaintiff was booked on February 14, 2004 on charges of first degree murder.  He was  appointed a public defender and subsequently pleaded guilty to that charge on June 24, 2005.

During his detention at TFCJ, Defendant Wayne Tousley was the elected Sheriff of the county of Twin Falls where the following individuals and named defendants were employed by the jail:  Stephanie Shaffer; Virgil Adams; Michael Carlson; Neil Schulz; Robert Wright; Douglas Hughes; Steven Byers; Susan Stringer; and Michael Guest.

### Cell Assignments.

At the time of Plaintiff's incarceration, the TFCJ housed an average of 190 inmates.  The Jail had three security classifications - minimum, medium and maximum. The record indicates Plaintiff was first classified as "medium" security and then at least by September 21, 2004, he was classified as "high."

During Plaintiff's detention, the only protective custody block at the TFCJ was the 900 block.  Jail policy provided that protective custody was warranted if the inmate's

ORDER - 5

presence in the general population posed a threat to life, property, self, staff or other inmates. It also could be utilized if the inmate requested such housing or required segregation for his or her own protection. Cells 901, 902 and 903 had video surveillance. Cell 905 was the only two-man cell in the 900 cellblock. Inmates in the 900 cellblock did not co-mingle with each other or other inmates.

The minimum security cells, cellblock 1300, housed individuals sentenced for misdemeanors and felonies. The vast majority of people housed in the 1300 block were sexual offenders or charged with sexual offenses. Plaintiff did not meet the classification for minimum security because the pending charge of first degree murder was a higher classification than minimum security housing would permit.

Medium security inmates were housed in the 600 cellblock and were inmates awaiting trial or sentencing that did not require a higher level of security. Cellblock 100 housed both convicted prison inmates and higher classification inmates (e.g. inmates who were pre-trial detainees with charges pending of a higher classification such as murder). Plaintiff met the classification requirements to be housed in cellblock 100.

Administrative segregation could be ordered when "the inmate requests segregation for his or her own protection" or for punitive measures when "the inmate's behavior while confined in disciplinary detention indicates the need for further segregation..." Jail policy stated that "the status of inmates in administrative segregation or protective custody shall be reviewed by the jail administration after seven 7 days and then every thirty 30 days thereafter." Though inmates may have suffered from mental illness, during Plaintiff's detention at the TFCJ, the jail did not house any individual *adjudicated* as mentally ill.

It is undisputed that while housed at the TFCJ for some 20 months, Plaintiff was periodically moved from one cell and cellblock to another. Plaintiff alleges that at one point he was moved by Defendant Stringer 56 times in 90 days, though the jail record of Plaintiff's housing moves show he was moved 22 times during his entire stay at the TFCJ. Plaintiff claims he was assaulted 18 times while incarcerated at the TFCJ and that

ORDER - 6

his cell assignments were made in retaliation and with the intent to cause him injury.
Defendants dispute these claims.

On February 15, 2004, the Plaintiff was placed in cellblock 200.

Plaintiff claims that on March 5, 2004 inmates in the 200 cellblock beat him up for three days, which is why, he claims he was put in cellblock 1300 on March 8th. Ct. Rec. 68 at 8. There is no evidence in the record of Plaintiff notifying the Defendants of these assaults.

Plaintiff asserts that on March 8, 2004, he was placed in cellblock 1300 by officer Kinyon.

On June 12, 2004, Defendant Adams moved Plaintiff from cellblock 1300 to cellblock 600. Defendant Adams claims he did this because he recognized that Plaintiff's charge of first degree murder was not consistent with a minimum security placement. Plaintiff claims Adams did this upon orders of Wright, Hughes and Byers, and the action violated his right to personal safety because it caused him to be assaulted 17 more times thereafter.

There are no records, medical or otherwise, to indicate Plaintiff was assaulted 17 more times. Detention officers noted altercations on July 6, 2004 and/or July 20, 2004, though no detail of these incidents is in the record.

Plaintiff remained in the 600 cellblock for six weeks, until he got into a fight with another inmate. On July 30, 2004, Plaintiff was moved to cellblock 400 by Detention Officer Jackson.

Jail records show that Detention Officer Kinyon moved Plaintiff into cellblock 200 on September 7, 2004 at the direction of Defendant Byers. Plaintiff claims he complained to staff that he feared he would be killed if they moved him to the 200 cellblock, but that they moved him anyway. Plaintiff claims that within twenty minutes after being placed in the 200 block, while he was on the telephone, he was attacked and stabbed twice in the right hand. Plaintiff's affiant, Fieldon Lenox, an inmate with Carr at the TFCJ, claims to have witnessed this attack. Plaintiff claims he showed Defendant

ORDER - 7

Carlson his injuries from this assault, filed kites for medical care, and for 2-3 days Carlson said he would help him get moved and medical care, but that he received no assistance.  Defendant Carlson does not recall being shown stab wounds, nor recall receiving a request to be moved.  Carlson denies promising Plaintiff he would be moved. Defendant Carlson worked from 6:00 p.m. until 6:15 a.m. on September 7, 2004.  He did not work after that time until September 11, 2004.

On September 20, 2004, while still in the 200 cell block, Plaintiff claims he went outside for recreation at which time Defendant Shaffer allowed the 100 block and 200 blocks to co-mingle during recreation, as was permissible.  He alleges this allowed inmates to gang up on him on the handball court, beat, kick, stomp and stab him.  He claims to have been nearly killed.  He claims he had 3 stab wounds to his face, 1 to the back of his head, multiple cuts, bruising, swelling, and that he was "kicked and stomped on so many times that some of my intestine popped through my stomach lining to form a hernia right above my belly button.  Ct. Rec. 48 at ¶ 20.  Plaintiff claims the assault occurred because Defendant Stringer had told the 100 and 200 block inmates that Plaintiff was giving information to the authorities.  Ct. Rec. 48 at ¶ 59.  Although Defendant Stringer was not working that day, Plaintiff alleges Stringer purposely made it possible for the two cellblocks to recreate together, so that they could attack him.  Ct. Rec. 48 at 61.  Plaintiff alleges Defendant Shaffer saw him coming in from recreation and just laughed as he stumbled back into the jail.

There is no evidence in the record of any deputy who witnessed the event Plaintiff alleges occurred while in outdoor recreation.  Defendant Shaffer denies placing the two cellblock inmates together in recreation on September 20, 2004 for the purpose of causing harm to Plaintiff.  Shaffer denies witnessing Plaintiff being assaulted or stabbed, bleeding, or laughing when Plaintiff left the recreation area.

According to his affidavit and incident report, later, Deputy Douglas Sudgen noticed Plaintiff sitting by the door of his cell, leaning against the wall with blood on his head.  Defendant Shaffer and Deputy Hoop responded to a report that Plaintiff was

ORDER - 8

bleeding.  When asked what had happened, Plaintiff claimed he had fallen in recreation on the handball, though the deputies could tell his injuries were more likely the result of a battery.  Shaffer and Hoop escorted Plaintiff to the jail medical center where he was seen by Nurse Judy Hepworth.  Hepworth states Plaintiff did not complain of abdominal pain, but needed stitches.  Plaintiff was then escorted to Magic Valley Emergency Room for stitches.  Medical records from the ER indicate Plaintiff had a 2.5 centimeter laceration below his left eyebrow and upper eyelid as well as a 1.5 centimeter laceration to his posterior scalp.  He also had some bruising to the left eyebrow.  Physicians Assistant Nick Perius closed the wound above his left eye with four sutures and the wound on the base of his head with two sutures and released Plaintiff with instructions for removal of the sutures six days later.  Plaintiff received no medication during this visit but was instructed to apply ice and take Tylenol for pain.  The stitches were removed on September 27, 2004, with no additional follow-up ordered by medical personnel.  Plaintiff told the deputies, Nurse Hepworth, emergency room staff, and even his attorney that his injuries were from a fall, not that he had been stabbed. Upon return from the ER, Plaintiff was placed in the 1300 cellblock.

The next morning, on September 21, 2004, Defendant Wright ordered Plaintiff to be assigned to cellblock 900, where he remained until his release to the state penitentiary on October 27, 2005.  Plaintiff admits stating he did not want to be placed back in the 200 cellblock.  Despite this, Plaintiff claims he was placed in the 900 block in retaliation for asking Defendant Guest if he could call an attorney. Ct. Rec. 48 at 78.  Plaintiff claims Guest responded to his request by stating "if you want to call an attorney, call one from the Hole." Ct. Rec. 68 at ¶ 26.  Defendant Guest denies these allegations. Defendants state Plaintiff was placed there for having been in the fight in the 200 cellblock and because of his own statement that he did not want to be placed back in the 200 cellblock.

The record suggests that Defendants considered Plaintiff to be  an escape risk. Multiple Defendants attested in their affidavits that Plaintiff had on many occasions

ORDER - 9

1   offered them a bribe to assist him in escaping and had otherwise mentioned escape
2   during his incarceration at the TFCJ. Carlson at ¶ 17; Adams at ¶ 19. Bratt at ¶ 6;  Guest
3   at ¶ 14; Shaffer at ¶ 19.  The detention officers initially believed Plaintiff was joking.  No
4   incident reports were ever written or formal disciplinary action taken in regards to
5   Plaintiff's comments about escape.

6          On the evening of September 21, 2004[1], the same day Plaintiff had been moved
7   into the 900 block cell, Defendants Carlson and Schulz located under the mattress in
8   Plaintiff's cell, an extra blanket, which had been fashioned into what appeared to be a set
9   of shorts and a shirt.  The incident report written by Carlson states, "It should be noted
10  that Carr is *currently* an escape risk and that these articles of clothing that he has made
11  are not orange in color and could indicate that he still has plans to escape custody." Ct.
12  Rec. 116, Ex. A (emphasis added).   Though the possession of such items was a violation
13  of jail rules, no disciplinary charges were brought.  Plaintiff claims the items found in the
14  cell were not his. Ct. Rec. 140 at 18. On February 21, 2005, Plaintiff was issued a
15  disciplinary warning for "possession of unauthorized clothing" (Ct. Rec. 124 at G), after
16  the discovery of two extra towels and a cross made from a jumpsuit in Plaintiff's cell. Ct.
17  Rec. 124.

18         During his 400 days in the 900 cellblock, Plaintiff was moved to various cells by
19  Defendant Adams and Schulz.  He spent a total of 124 days in single-man cells (Feb 3-
20  12, 2005; March 4, 2005, March 12-June 5, 2005; June 16-18, 2005; June 25-July 23,
21  2005). The majority of his time in single-man cells was spent in video-surveillance cells,
22  902 and 903.  The other 276 days in the 900 cellblock were spent in cell number 905, the
23  block's only two-person cell.  While in cell 905, Plaintiff alleges he was housed with
24  "dozens of inappropriate cellmates" who were there for being "uncontrollably violent",
25
26         [1] The court notes that Defendants statement of facts and affidavits have stated that
27  this "street clothes" incident occurred on February 21, 2005, but the incident reports filed
28  say it occurred on September 21, 2004.

ORDER - 10

discipline, protective custody or severe mental illness.  Ct. Rec. 48 at 49.  Plaintiff claims while in 905 he was housed with mentally ill inmates who would "scream, curse, kick their doors, and throw human wastes such as feces, and bodily fluids everywhere."  Ct. Rec. 48 at ¶ 44.  For 12 days, Plaintiff's cellmate was Wayne Dine.  Plaintiff alleges Dine "mostly stayed naked and threw and smeared his poop everywhere, for 3 weeks" and that the Defendants placed him with Dine for their entertainment.  Ct Rec. 48 at ¶ 49. Defendant Adams removed Dine from the cell and did not participate in the decision to place Dine there.

Plaintiff claims cell 905 had human feces on the walls and that Defendants failed to remove it or give him cleaning supplies to remove it.  Plaintiff alleges that Defendant Adams would make him live in the human waste for sometimes up to a week at a time. Ct. Rec. 48 at 113.  Defendants admit that inmates would occasionally scream, curse, kick their doors, and throw human waste while housed in the 900 block.  Defendant Guest does not recall seeing any feces, and claims if it had been noticed he would have had it removed.  Inmate cells were inspected every morning and inmates received cleaning supplies every day.

On February 3, 2005 and February 12, 2005, Defendant Stringer made the decision to place Plaintiff in a video surveillance cell.  Plaintiff alleges he was placed there by Stringer in retaliation after his parents hired him an attorney and so that Plaintiff "could not fight [his] case."  Ct. Rec. 48 at 69.  Defendant Stringer denies placing him there for these reasons.  Defendant Stringer states she made this decision after having been shown notes apparently authored by the Plaintiff to a female inmate violating jail policy against inmate communications.  She made this decision also because a portion of the note apparently read "I'm in 900 block because I'm a 195 pound 6 ft 2 in tall violent shitstick. I have kicked the shit out of 17 of the baddest inmates this jail had to offer and I'm an escape risk.  The guards lock me down and escort me 2 cops at a time because they know if I see a chance to go they can't stop me."   This note suggested to Stringer an intent on Plaintiff's part to attempt an escape.

Plaintiff complains that while in the video surveillance cell, Defendant Stringer, a female, had the ability to watch him when he was undressed. Ct. Rec. 48 at ¶ 69. Surveillance equipment was controlled by an officer in the control room who had numerous screens to view, showing black and white images of the jail. Monitors shifted from one camera view to the next an average of every ten (10) seconds. Showers were not under video surveillance.

On June 25, 2005, Plaintiff was moved to a video surveillance cell by Defendant Schulz. Plaintiff alleges it was in retaliation for him having attempted to file a motion to withdraw his guilty plea. Defendants deny the allegation.

### Cell Lighting.

Plaintiff's Amended Complaint includes an allegation that the cell lighting used 24 hours a day caused him headaches, eyepains, sleeplessness, and mental instability. Ct. Rec. 48 at ¶ 41. Fluorescent lighting was used at the TFCJ during the day. Smaller night lights were used from 11:00 p.m. until 5:00 a.m. The daylights were two 40-watt bulbs and the nightlight was a single 9 watt bulb. The low level lighting allowed detention officers to conduct security checks while maintaining officer and inmate safety.

### Heating and Ventilation.

Plaintiff alleges that while housed in cell 905, Defendants purposely shut down his cell's ventilation and kept the block's back door open, causing him to have to live in outdoor temperatures. Ct Rec. 48 at ¶ 48. Plaintiff contends each cell in the 900 block had a vent door that could be opened or shut. In addition to the exterior door, he claims his cell's vent door was kept open. Ct. Rec. 142 [Brief re: Shaffer] at ¶¶ 11, 12. Defendants dispute these allegations.

Individual cells did not have their own ventilation system, nor did the 900 cell block. The ventilation system is system-wide. The cell blocks had separate temperature controls, which was maintained by the maintenance department between 72 and 78 degrees. Detention officers did not have the ability to alter the temperature.

ORDER - 12

The exterior doors of the TFCJ were operated by central control.  The door between the 900 block and the annex foyer was opened by the control room and closed by the individual officer.  If the officer did not immediately close the door a red light was activated in the control room.  The outside or exterior doors of all cellblocks were operated by the control room.   There were emergency keys for operating the exterior doors, but the keys were kept in a lock box in the control room.  An emergency key was never used by only one person; two people accompanied the emergency keys at all times. Security considerations would forbid leaving an exterior door open.

During Plaintiff's detention inmates were provided double blankets in winter.

*Cell noise.*

Plaintiff claims he was housed with mentally ill inmates who would "scream, curse, kick their doors, and throw human wastes such as feces, and bodily fluids everywhere." Ct. Rec. 48 at ¶ 44.  Plaintiff contends the noise was very loud and "went on 24 hours a day" and that the Defendants enforced a "No Hearing Protection Policy." Defendants admit that inmates would occasionally do this, however Defendants deny it was a regular occurrence during the time Plaintiff was housed in the 900 block. Ct. Rec. 53 at 17.

### Recreation and Out of Cell Time.

Plaintiff claims during his 400 days in the 900 block, he was "denied recreation many times for weeks on end." Ct. Rec 48 at ¶ 38.  He alleges it was Defendant Stringer who denied him his one hour out at least 150 times. Ct. Rec. 48 at ¶ 67.   Defendants deny these allegations.

During Plaintiff's detention, "recreation time" was required five times per week, one hour per time.  In non-segregated blocks, two blocks recreated together.  Inmates in the 900  cellblock recreated individually, one inmate at a time.  Inmates had access to indoor and outdoor recreation areas through an unlocked door.  Inmates were not required to go outside, and were not permitted outside if it was wet or raining.  The indoor exercise area had a small library, television, toilet and an isometric apparatus.

ORDER - 13

In addition, "out of cell time" was offered to inmates allowing inmates to leave their jail cell and move about in the cellblock.   Defendant Stringer states she did not treat Plaintiff different from other inmates.  At times jail safety necessitated ordering the Plaintiff back in his cell.  Defendant Stringer specifically recalls ordering Plaintiff back into his cell because she observed him trying to attract female inmates while they were exercising.

It is undisputed that inmates at the TFCJ were never given jackets, hats, boots or gloves for outdoor recreation in 2004 and 2005 based on alleged temperate weather conditions in the area.

### *Verbal harassment.*

Plaintiff has alleged various Defendants made numerous inappropriate comments to him while incarcerated at the TFCJ.  For example, he alleges Stringer would tell inmates lies such as he was a rapist, child molester, a rat, a snitch, that he was caught trying to escape, and/or that he was in protective custody.  Ct. Rec. 48 at 64.  Plaintiff alleges Defendant Adams told inmates he was a "rat", "a snitch", a "homosexual" and that the inmates should sodomize him.  Ct. Rec. 48 at 107.  Plaintiff alleges Adams wrote "RAT" on his cell door.  Ct Rec. 48 at 109.  Plaintiff alleges Defendant Carlson made "homosexual advances and comments" to him on many occasions.  Ct. Rec. 48 at 119.  He also claims one incident in or around December 2004, when Plaintiff made fun of Carlson, Carlson stormed into his cell and "broke a lot of my property and told me he would handcuff me to my stool and fuck me in the ass."  Ct. Rec. 48 at 119.  Plaintiff alleges Defendant Carlson would stand and watch him shower and make comments while he was showering.  Ct. Rec. 48 at 120.

Defendants deny all allegations of inappropriate comments.  Defendants attest that writing the word "rat" or similar words, on a cell door, would result in immediate disciplinary action against the employee, up to and including dismissal.  The corridors of the TFCJ were under continuous visual and video surveillance by detention officers in the control room and those making rounds in the cellblocks.

ORDER - 14

*Medical and Food Issues.*

Beginning in October 2004, the TFCJ contracted with third party vendor, ABL Food Service, to supply food to the TFCJ inmates. After the food was prepared, it was distributed to inmates on trays, which were counted. Detention officers and inmate workers delivered the food to each inmate. It was not possible for kitchen staff to determine which tray would be delivered to which inmate. At no time did any detention officer have control over choosing or preparation of an inmate's food.

Plaintiff alleges Defendant Guest retaliated against him because Plaintiff had called him names. Plaintiff alleges that between October 5 and December 5, 2004, Defendant Guest fed him and his cell-mate "tainted" food on four occasions, which caused them to become ill. Ct. Rec. 48 at 82-84. He claims his written and verbal requests for medical attention were denied. Ct. Rec. 48 at 85. After he complained, Plaintiff claims Defendant Shaffer then put him on a "no food diet" leaving him with no food for days on four occasions, resulting in a weight loss of 60 pounds. Ct. Rec. 48 at 86. He claims she did this with no food two times for three days and once for four days and once for five days. Ct. Rec. 48 at 98. Plaintiff claims Defendant Carlson obeyed Shaffer's instructions not to feed him. Ct. Rec. 48 at 118.

Defendants deny these allegations and allege Plaintiff has fabricated this claim. Defendants have no record of having ever received any notice by Plaintiff or any other third party regarding Plaintiff's food. There is no grievance on record regarding Plaintiff's food. Plaintiff's entire medical record on file with the TFCJ is in the voluminous record in this case. Plaintiff's medical file does not contain a record of his being seen for medical care regarding complaints of food-borne illness. Each cell and each cell block had an emergency call box. Plaintiff had the ability to press the call button in his cell and contact the control room if he did not receive food as scheduled.

Plaintiff also claims to have suffered from migraines and that beginning in March 2004 he started filing kites related to many things, including medical care. He specifically claims to have been denied medical care after his September 6, 2004 injury,

ORDER - 15

after his September 20, 2004 return from the ER, and throughout his stay at TFCJ. Defendants all state they do not recall Plaintiff telling them he was sick and needed medical attention, but if he had, they all claim they would have signed him up to see medical staff.

Plaintiff was seen by medical staff on December 7, 2004 complaining of a lump above his bellybutton which hurt to the touch. This was diagnosed as a potential umbilical hernia.

Jail policy provided that "If an inmate has medications, or they are prescribed while in custody, these medications will be dispensed as per prescription instructions, and will be consumed in front of the detention officer. No medications will be allowed in the housing units or cells unless a doctor advised that the inmate must keep certain types of medication with him/her...If an inmate requires non-prescription medications, such as cold tablets, aspirin, antacids or Tylenol, they will be dispensed by request as needed, and will be taken in front of the detention officer. They will not be allowed in the housing units or cells."

*Mail*.

Pursuant to jail policy, all incoming mail was to be opened and searched for contraband in front of the inmate. This included legal correspondence. Jail policy provided that outgoing mail would not be read or searched unless it had been determined to be a threat.

As part of her duties, Defendant Shaffer notarized documents and placed them in a box for delivery to the courthouse.

On October 17, 2005, Shaffer notarized Plaintiff's petition for habeas corpus. It was filed on October 20, 2005.

On October 18, 2005, just 4 days after he was sentenced, the Twin Falls Jail gave notice to the Idaho Department of Corrections that "[Plaintiff] is an escape risk we foiled a plan that he had made and have moved him to segregation - would like this Convict

ORDER - 16

moved ASAP."   Plaintiff alleges his habeas petition, filed October 20, 2005, was then denied as moot because he had been moved by that time.

Plaintiff claims to have filed with Shaffer other pro-se pleadings, which he claims never reached the courts.  Defendant Shaffer denies ever stealing or refusing to file any legal documents with the courts.

### Cell Searches/Confiscation of Property.

Plaintiff alleges Defendants, specifically Stringer and Adams, would conduct (or ask others to conduct) cell searches and confiscate Plaintiff's "evidence" of wrongdoing in the jail, such as journals containing names, dates and causes of action. Ct. Rec. 48 at 53, 70, 71.  Defendants admit cell searches were performed, but deny confiscation of his evidence or pleadings.

### Legal Access.

Plaintiff claims that during his incarceration he was only permitted one 45 minute visit, in March 2005, to the law library, despite daily requests and kites since March 2004. Ct. Rec. 48 at ¶ 26.  Defendants contend that during Plaintiff's detention inmates were not provided with a "fully equipped law library."  Defendants state there were some volumes of the Idaho Code at the TFCJ, but rather than a law library, Defendants contend inmates were provided access to a free attorney.  Defendants contend the inmate handbook provided the inmate with information on how to contact the attorney.  Plaintiff claims that during his incarceration the TFCJ did have a law library and did not have a contract attorney.   The jail's operations manual indicates that, "All inmates have the right to use the jail's legal resource center at reasonable times to use law books or other materials necessary for defending themselves in any criminal or civil matter.   A written request must be given to the floorman to schedule use of the legal resource center." Ct. Rec. 120, Ex. A., Bates Stamp DO328.

Plaintiff alleges jail policy forced him to make attorney phone calls on the monitored phone lines. Ct. Rec. 48 at ¶¶ 30-31.  Defendants dispute that Plaintiff was forced to use the monitored line and states that upon his request, he could use a phone

ORDER - 17

that was not monitored to talk to his attorney.

The TFCJ General Operations Manual in place at the time of Plaintiff's detention states in regard to telephone usage that phones for making collect calls only were available in each "housing unit." Ct. Rec. 120, Ex. A. "If the phone call cannot be placed on the collect call phone the inmate may request outside phone use. These requests will be judged by the nature and urgency of the business and will only be granted as time and security permits." *Id.* As Plaintiff also points out, the Operations Manual, under the heading "Legal Access" states that "[a]ttorneys [other than the public defender] will have to be contacted by mail or phone, if they will accept it. The jail staff will only allow phone calls on phones outside the housing unit in an emergency situation." *Id.*

It is undisputed telephones for making collect and monitored calls were available in the housing units. Inmates were on notice of the monitoring and collect nature of the line. Recordings were destroyed after sixty days. Defendants Wright, Byers, Hughes and Sergeant Hoop had the ability to monitor attorney-client telephone calls. They were the only individuals who had authority to operate the recording device and no other staff was permitted to listen to conversations between an inmate and an attorney. The other Defendants deny having ever listened in on Plaintiff's calls at any time. Ct. Rec. 53 at 13.

Plaintiff alleges "jail staff" could and would audio and/or video monitor his attorney's visits. Ct. Rec. 48 at ¶ 34. Plaintiff complains that attorney visits were not private and that other inmates and staff standing nearby could listen in. The attorney visiting room was equipped with an intercom station with a toggle switch that could be controlled by the attorney only. Sometimes attorney visits would take place in the TFCJ classroom, where there was only video surveillance, but no two-way audio monitor or intercom.

The way to contact the public defender was by using the Legal Access to Court Request form.

### Denial of Kite System

ORDER - 18

1

Plaintiff alleges he "sent many written concern forms called 'kites' to the
2   administration of the jail explaining the extreem [sic] circumstances" but they all went
3   unanswered. Ct. Rec. 48 at ¶ 18.   Defendants admitted in their Answer that Plaintiff
4   sent many written "kites" to the administration of the Jail. Ct. Rec. 53 at 10.
5       In 2004 and 2005, upon admission to the TFCJ, inmates were provided the so-
6   called "kite" forms entitled "Letter to the Detention Staff" and received a copy of the
7   grievance policy.   On the kite form, the inmate had the option of checking a box to
8   designate the type of concern of letter raised.  Choices were: "special visit"; "phone
9   call"; "inmate worker"; "walker center";"law library"; "grievance"; "bond amount";
10  "phone #"; and "courts".   Medical requests had a separate form the inmate could use.
11  An inmate could submit a grievance using this form, plain paper, or another form called
12  Legal Access to Court Request Form.   Inmates could ask the deputy on duty for a Letter
13  to Detention Staff.  Inmates were provided paper and pencil in their cells.
14      All Letters to Detention Staff were handled by either the deputy on duty or
15  command staff, depending on the nature of the Letter.   Employees were required to
16  answer the Letter, photocopy the Letter with the answer and provide a copy to the inmate
17  and one for the inmate's file.  The jail forms were not designed with carbon copies.
18  Sometimes routine requests were granted without a written answer being prepared.  Any
19  denial of an inmate's request was required to be in writing.
20      Defendants admit they received many "kites", but all attest that no verbal or
21  written *grievance* pertaining to any of the issues complained of in the Amended
22  Complaint was ever made.  None of the forms maintained in Plaintiff's jail inmate file
23  were designated as a "grievance."  In addition, the Defendants claim that no other blank
24  pages, letter or other form was used to lodge as a "grievance" about any of the issues
25  complained of in the Amended Complaint.   Plaintiff disputes that he did not file any
26  grievances.
27      ***Miscellaneous Other Conditions of Confinement.***
28      During Plaintiff's detention, inmates were permitted to keep soap, shampoo, and

ORDER - 19

legal papers in their cell. Inmates in non-segregated cellblocks were permitted to shower at any time they chose from 6:00 a.m. to 11:00 p.m., unless jail security at that time prohibited an inmate from using the shower facilities or the jail was in lockdown. Inmates in the 900 cellblock were permitted to shower at any time they chose from 6:00 a.m. to 11:00 p.m., as long as the shower was not in use by another inmate, unless jail security prohibited any inmate from using the shower facilities or the jail was in lockdown. Shower stalls were not under video surveillance.

Inmates in the 900 block were able to attend A.A. and N.A. meetings and request visiting time with a chaplain or religious provider. Defendants deny Plaintiff ever submitted grievances regarding A.A., N.A. or religious meetings.

***Training and Supervision.***

Defendant Tousley was the Sheriff of the Twin Falls County Sheriff's Department which was responsible for the Twin Falls County Jail.  He was the supervisor of the jail during Plaintiff's detention at the TFCJ, but he did not directly supervise Plaintiff.  There are no allegations of Tousley's personal involvement in any of the allegations in the Amended Complaint.

Defendant Adams was employed as a deputy at the TFCJ and supervised Plaintiff at times.

Defendant Byers was employed at the TFCJ during Plaintiff's detention and supervised Plaintiff at times.  He also was charged with implementing policy and held management and supervisory training.

Defendant Carlson was employed as a deputy at the TFCJ during Plaintiff's incarceration and supervised Plaintiff at times.

Defendant Guest was a Sergeant at the TFCJ during Plaintiff's incarceration and supervised Plaintiff at times.

Defendant Hughes was a Lieutenant during the time Plaintiff was incarcerated at the TFCJ and supervised Plaintiff at times.

Defendant Shaffer was employed as a Sergeant at the TFCJ during Plaintiff's

ORDER - 20

incarceration.  Defendant Shaffer supervised Plaintiff at times.

Defendant Schulz was a Deputy II and Detention Deputy at the TFCJ during Plaintiff's incarceration and supervised Plaintiff at times.

Defendant Stringer was employed as a Staff Sergeant at the TFCJ and oversaw deputies who supervised Plaintiff.

Defendant Wright was employed as the Captain and Administrator of the TFCJ during Plaintiff's detention.  He was charged with implementing policy.  He had no interaction with Plaintiff and does not recall ever receiving any written or verbal grievance from Plaintiff relating to the allegations in his Amended Complaint.

In 2004 and 2005, Defendant Tousley held weekly supervisory meetings with the command staff, monthly meetings with the supervisors, and met with TFCJ Commander weekly.  During these meetings, they discussed matters including policy implementation and inmate discipline, health, and welfare.

Training records for the individual Defendants show they complied with all requirements regarding training and certification.  The TFCJ passed all jail inspections by the Idaho State Sheriffs's Association during Plaintiff's detention.

Writing the word "rat," or similar words on a cell door would result in immediate disciplinary action against the TFCJ employee, up to and including dismissal.

The corridors of the TFCJ were under continuous visual and video surveillance by detention officers in the control room and those making rounds in the cellblocks.

Each cellblock was visible through glass doors to food service workers, clergy and law enforcement personnel.

The conduct of the detention officers in the cellblocks was subject to video surveillance at all times.

**III. LEGAL STANDARDS**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to

ORDER - 21

1    judgment as a matter of law. Fed.R.Civ.P. 56(c ); *Celotex Corp. v. Catrett*, 477 U.S. 317,

2    322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party shows that there is an

3    absence of evidence to support the non-moving party's claims, the burden shifts to the

4    non-moving party resisting the motion to "set forth specific facts showing that there is a

5    genuine issue for trial." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 256, 106 S.Ct.

6    2505, 91 L.Ed.2d 202 (1986). "A material issue of fact is one that affects the outcome of

7    the litigation and requires a trial to resolve the parties' differing versions of the truth."

8    *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1305-06 (9th Cir. 1982).

9          To successfully rebut a properly supported motion for summary judgment, the

10   non-moving party "must point to some facts in the record that demonstrate a genuine

11   issue of material fact and, with all reasonable inference made in the plaintiff[ ]'s favor,

12   could convince a reasonable jury to find for the plaintiff[ ]." *Reese v. Jefferson Sch. Dist.*

13   *No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000) (citations omitted).  The question to be

14   resolved is not whether the "evidence unmistakably favors one side or the other, but

15   whether a fair-minded jury could return a verdict for the plaintiff on the evidence

16   presented." *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.

17   1995).  This requires more than the "mere existence of a scintilla of evidence in support

18   of the plaintiff's position"; there must be "evidence on which the jury could reasonably

19   find for the plaintiff." *Id.* The more implausible the claim or defense asserted by the

20   nonmoving party, the more persuasive its evidence must be to avoid summary

21   judgment." *Id.*

22         The court is mindful that Plaintiff is proceeding pro se and is incarcerated. "Pro se

23   prison inmates, with limited access to legal materials, occupy a position significantly

24   different from that occupied by litigants represented by counsel." *Jacobsen v. Filler*, 790

25   F.2d 1362, 1365 n. 4 (9th Cir. 1986) (citation omitted). Courts have a duty to liberally

26   construe the pleadings of pro se litigants, particularly those filed by pro se prisoners. See

27   *Zichko v. Idaho*, 247 F.3d 1015, 1020 (9th Cir. 2001). Pro se litigants are nonetheless

28   bound by "the same rules of procedure that govern other litigants," *King v. Atiyeh*, 814

ORDER - 22

F.2d 565, 567 (9th Cir.1987), including Rule 56's requirement that a non-moving party "must present some significant probative evidence tending to support the complaint" in order to survive summary judgment. *Franklin v. Murphy*, 745 F.2d 1221, 1235 (9th Cir. 1984) (citation and internal quotes omitted).

The court construes Plaintiff's pleadings liberally. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). The court is not, however, required to "comb the record to find some reason to deny a motion for summary judgment," even when the plaintiff is proceeding pro se. *Tran v. California*, 280 Fed.App. 653, 653 (9th Cir. 2008) (*quoting Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001)) (affirming district court's grant of summary judgment against pro se plaintiff).

In deciding a motion for summary judgment, the Court considers the evidence in the light most favorable to the non-moving party. *Porter v. Cal. Dep't of Corr.*, 383 F.3d 1018, 1024 (9th Cir. 2004). The court does not make credibility determinations or weigh conflicting evidence; these determinations are for the trier of fact and inappropriate for summary adjudication proceedings. *Anderson*, 477 U.S. at 249. The court need not, however, accept legal conclusions cast in the form of factual allegations. *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

**IV. Defendants' Motions to Strike**

Defendants have thoroughly drafted two motions to strike -- Defendants' Motion to Strike Documents (Ct. Rec. 158) and Motion to Strike Affidavits (Ct. Rec. 158). In their motions, Defendants have painstakingly analyzed (and charted) the Plaintiff's evidence requesting the court strike all or portions of the evidence on the following grounds: 1) the documents attack the underlying conviction and are therefore not admissible; 2) the documents do not meet the minimum standards of an admissible declaration under 42 U.S.C. 1746; or 3) the documents do not meet evidentiary requirements of Fed.R.Civ.P. 56(e)(1).

These motions have assisted the court in reviewing the Plaintiff's evidence. Many documents are duplicative of documents already submitted by the Defendants or they

were provided by the Defendants to the Plaintiff in discovery. The Defendant has moved to dismiss all of the documents because Plaintiff has not authenticated or laid the foundation for the admission of the documents. The court will not strike Plaintiff's submissions on a technical ground that could be easily remedied under Federal Rule of Evidence 901, but will consider Plaintiff's claims on the merits.

The court also declines to proceed through every exhibit and affidavit, line by line, ruling on each challenged statement, though the court appreciates the Defendants' thoroughness in doing so. The court will evaluate all of Plaintiff's evidence in conjunction with its analysis of the facts of this case, discounting any statements or evidence that contain inadmissible hearsay, legal conclusions, or are not based on personal knowledge. See Fed.R.Civ.P. 56(e) (requiring that affidavits opposing summary judgment be made on personal knowledge, set forth such facts as would be admissible in evidence, show that the affiant is competent to testify to the matters stated in the affidavit, and set forth specific facts showing that there is a genuine issue for trial). The court will ignore that which is not relevant, which the court finds, much of it is.

Five documents, Plaintiff's Exhibit 1000-53, 1000-54 and Exhibit B-C are handwritten kites by Plaintiff designated as "grievances" allegedly from 9/9/04, 9/23/04 and 10/26/05 respectively. None of these grievances were part of Plaintiff's inmate file maintained by the TFCJ. In addition, Exhibits B-A and B-B are two Legal Access to Courts request forms written by Plaintiff allegedly from 9/8/04 and 9/24/04. Defendants claim Exhibits B-A, B-B, and Exhibit B-C were not produced in discovery. Plaintiff has not submitted an affidavit indicating when any of these documents were prepared, who they were delivered to, or how he retained this copy, when he has argued he was denied copies of his grievances. At this stage of the litigation process, the court denies Defendants' motion to strike these documents. In any event, considering the court's ultimate ruling herein (see infra), Defendants' are not prejudiced by the court's denial of their motion to strike.

**V. DISCUSSION**

## A. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act's (PLRA) requirement that a prisoner exhaust available administrative remedies before instituting litigation is intended to allow corrections officials the opportunity to take corrective action and hopefully filter out frivolous claims. The requirement seeks to reduce the quantity and improve the quality of prisoner suits. The fact that exhaustion is a mandatory precondition to suit makes it ordinarily a threshold issue reviewed in every prisoner lawsuit. Issues of exhaustion can usually be resolved in a straightforward manner without the need for extensive discovery and prior to the beginning of merits discovery. This case is an exception.

Plaintiff makes at least 23 claims pertaining to his conditions of confinement which are subject to the exhaustion requirement of the PLRA. On January 22, 2008, the court denied Defendants' motion to dismiss for failure to exhaust because the record was insufficient for the court to make the necessary, and permissible, factual determinations to render a conclusion regarding exhaustion. *See Wyatt v. Terhune*, 315 F.3d 1108, 1119-20 (9th Cir. 2003)(holding courts may decide disputed issues of fact, in deciding a motion to dismiss for failure to exhaust). Though Plaintiff admitted he did not exhaust his administrative remedies, he claimed the Defendants had frustrated his attempts to exhaust by throwing away or disregarding his grievances. Affidavits of numerous fellow inmates attested that this was frequently the case at the jail. The defendant jail employees supervising Plaintiff simply asserted they did not "recall" ever receiving any written or verbal "grievance" in regards to Plaintiff's claims in the Amended Complaint. In its prior Order, the court detailed some of the missing material facts and denied Defendants' motion.

Instead of filing another motion or requesting an evidentiary hearing on the issue of exhaustion, Defendants filed summary judgment motions on the merits and their entitlement to qualified immunity as to all of Plaintiff's claims, including those subject to the exhaustion requirement. The court understands the defense position to be: Various obstacles to resolving the question of exhaustion, including potentially costly litigation

and hearings, complex issues, and questions of credibility, should not be allowed to obscure the fact that the underlying claims, though numerous, are totally without merit.

Because, after extensive review of the case, the court agrees the claims must be dismissed on their merit (or lack thereof), it would be a waste of the resources of both the litigants and the court to at this point mandate the resolution of the exhaustion issue first. Indeed, the court is not aware of any authority binding on this court which straightjackets the court into deciding the exhaustion question before the merits of the summary judgment motions. *See Woodford v. Ngo*, 548U.S. 81, 126 S.Ct. 2378, 2392, 165 L.Ed.2d 368 (2006) (considering dismissal under 42 U.S.C. § 1997e(c)(2), stating PLRA exhaustion requirement is not jurisdictional; district court may "dismiss plainly meritless claims without first addressing what may be a much more complex question, namely, whether the prisoner did in fact properly exhaust available administrative remedies"). Without having decided whether Plaintiff's failure to exhaust is excused or not, the court will proceed to address the merits of the summary judgment motions.

**B. 42 U.S.C. § 1983 and Qualified Immunity**

Plaintiff here pursues claims pursuant to 42 U.S.C. § 1983, which requires an allegation of the violation of a right secured by the Constitution and laws of the United States, and a showing that a person acting under color of state law committed the alleged deprivation. *West v. Atkins*, 487 U.S. 42, 48 (1988). "Since a section 1983 cause of action is against a 'person,' in order to recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right." To be personally responsible, an official must know about the conduct or facilitate it, approve it, condone it, or turn a blind eye.

Qualified immunity shields government officials performing discretionary functions from civil liability if their actions were objectively reasonable in light of clearly established law at the time they acted. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield

officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009).

Analysis of the qualified-immunity defense generally proceeds under the two-step, sequential inquiry articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The first inquiry is whether the facts, viewed in the light most favorable to the party asserting injury, show the officer's conduct violated a constitutional right. When conducting this inquiry at the summary-judgment stage, the court adopts the plaintiff's version of the facts. If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. The second step of the qualified immunity analysis addresses whether the constitutional right at issue was clearly established such that a reasonable official would have understood that his behavior violated that right. This inquiry is undertaken in light of the specific context of the case, not as a broad general proposition. In summary, if the official's alleged conduct violated a clearly established constitutional right of which a reasonable official would have known, he is not entitled to qualified immunity.

While it is often appropriate to address the qualified immunity analysis by considering these two steps in sequence, it is not mandatory. *Pearson,* 129 S.Ct. at 818 (2009)(modifying *Saucier v. Katz*). District courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

For the reasons described below, the court finds Defendants entitled to summary dismissal of Plaintiff's claims.

**C. Defendant Schultz**

The only allegations against Defendant Shultz are that he "eyewitnessed the majority of these violations" and "laughed about and joked about these actions with the other defendants while they violated my rights, making Shultz guilty of inaction..." Ct. Rec. 48 at ¶ 125. In the Amended Complaint, Plaintiff admits Shultz "did not physically

ORDER - 27

act" and states that he would move the court to dismiss Shultz as a defendant. *Id.* at ¶ 126. Plaintiff has failed to allege any conduct for which Defendant Shultz could be held personally liable under § 1983, and thus the claims in the Amended Complaint against Defendant Shultz must be dismissed.

**D. Fourteenth Amendment Due Process Claims**

When a pre-trial detainee challenges some aspect of his pretrial detention, the issue to be decided is the detainee's right to be free from punishment. *Bell v. Wolfish*, 441 U.S. 520, 533, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."). Such challenges arise under "the 'more protective'" Fourteenth Amendment Due Process Clause, rather than the cruel and unusual punishment clause of the Eighth Amendment. *Jones v. Blanas*, 393 F.3 d 918, 931 (9th Cir.2004) (quoting *Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir.1987)). *But cf. Frost v. Agnos*, 152 F.3d 1124, 1130 (9th Cir.1998) ("Because pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment, however, we apply the same standards.").

While the Due Process Clause protects pretrial detainees from punishment, not every disability imposed during pretrial detention constitutes "punishment" in the constitutional sense. *Id.* at 537. The test for identifying unconstitutional punishment at the pretrial stage of a criminal proceeding requires a court to examine "whether there was an express intent to punish, or 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].' " *Demery v. Arpaio*, 378 F.3d 1020, 1028 (9th Cir. 2004) (quoting *Bell*, 441 U.S. at 538). "For a particular governmental action to constitute punishment, (1) that action must cause the detainee to suffer some harm or 'disability,' and (2) the purpose of the governmental action must be to punish the detainee." *Id.* at 1029. Further, "to constitute punishment, the harm or disability caused by the government's action must either significantly exceed, or be

ORDER - 28

independent of, the inherent discomforts of confinement." *Id.* at 1030. "The circumstances, nature, and duration of a deprivation ... must be considered in determining whether a constitutional violation has occurred," *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).

A detainee's desire to be free from discomfort does not rise to the level of a fundamental liberty interest under the Fourteenth Amendment:

> Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention. Traditionally, this has meant confinement in a facility which, no matter how modern or how antiquated, results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial. Whether it be called a jail, a prison, or a custodial center, the purpose of the facility is to detain. Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility. And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment."

*Bell*, 441 U.S. at 537.

Legitimate governmental objectives that may justify adverse detention conditions include maintaining security and order and operating the detention facility in a manageable fashion. "[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell*, 441 U.S. at 546. *Accord Jones*, 393 F.3d at 932 ("Legitimate, non-punitive government interests include ensuring a detainee's presence at trial, maintaining jail security, and effective management of a detention facility.") Moreover, corrections administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547.

To determine whether detention restrictions or conditions are reasonably related to maintaining security and order and operating the institution in a manageable fashion, courts ordinarily should defer to the expert judgment of correction officials in the absence of substantial evidence that indicates officials have exaggerated their response

ORDER - 29

1
2    to these considerations. *Bell*, 441 U.S. 540 n. 23. A reasonable relationship between the
3    governmental objective and the challenged condition does not require an "exact fit," a
     showing that it is the "least restrictive alternative," or proof that the policy does in fact
4    advance the legitimate governmental objective. *Valdez v. Rosenbaum*, 302 F.3d 1039,
5    1045 (9th Cir. 2002). But it does require evidence that the correction officials' judgment
6    was rational, i.e., they might have reasonably thought that the policy would advance a
7    legitimate governmental objective. *Id.*

8         Thus, to find that a condition of confinement for pretrial detainees constitutes a
9    current and ongoing violation of the constitutional minimum under the Fourteenth
10   Amendment, the Court must determine that the condition:

11        (1) imposes some harm to the pretrial detainees that significantly exceeds or is
12   independent of the inherent discomforts of confinement; and

13        (2)  is not reasonably related to a legitimate governmental objective or
14        (3) is excessive in relation to the legitimate governmental objective.

15   **1. Conditions of Confinement**

16        a. *Cell  Lighting*

17        Plaintiff claims the 24-hour cell lighting caused headaches, sleep deprivation
18   and other ill effects.  The undisputed facts establish daylights used were two 40-watt
19   bulbs and the nightlight was a single 9 watt bulb, which allowed detention officers to
20   conduct security checks while maintaining officer and inmate safety.  Sheriff Tousley
21   states in his affidavit that the lighting levels at the TFCJ at the time Plaintif was there
22   had not changed since these conditions were adjudicated in *Murray v. Sheriff Wayne*
23   *Tousley*, et al., Case No. CV 01-229-S-EJL.  In that case, the court noted that the TFCJ
24   use of low-wattage blue-light night lights during an inmate's sleeping hours, though
25   perhaps an "imperfect compromise," was not a prison condition posing a substantial
26   threat of harm.  The use of the night lights is rationally related to the purpose of jail
27   security and the conditions as alleged at the TFCJ did not exceed this purpose.  Since the
28   need for low-level night lighting in the jail cells is reasonably related to a legitimate

ORDER - 30

governmental objective, Defendants are entitled to summary judgment on this claim.

     b. *Noise Level*

     Allegations of excessive noise in a prison can support a valid Eighth or Fourteenth Amendment claim. *See, e.g., Toussaint v. McCarthy*, 801 F.2d 1080, 1110 (9th Cir.1986) (affirming scope of relief granted by district court for noise level in the prison; evidence showed that there was a "constant level of noise" which adversely affected the inmates' hearing); *Kost v. Kozakiewicz*, 1 F.3d 176, 180 (3d Cir.1993) (section 1983 challenge to conditions of confinement, including allegations of unbearable noise pollution causing inmates to suffer degenerative hearing, should not have been dismissed on ground that issues were addressed in context of previous class action suit); *Inmates of Occoquan v. Barry*, 844 F.2d 828, 848 (D.C.Cir.1988) (excessive noise caused by unregulated television volume settings constituted constitutional violation only in combination with numerous other systemic deficiencies; proper to base holding on testimony that it was "necessary to almost shout to be heard"); *Williams v. Boles*, 841 F.2d 181, 183 (7th Cir.1988) (incessant noise may cause agony even though it leaves no physical marks).

     In this case, however, the allegations in the complaint and the materials submitted in the summary judgment proceeding establish that Defendants are entitled to judgment. Plaintiff simply alleges noise was "very loud" and went on all day and night.  The record contains no evidence that noise levels posed a serious risk of injury or were anything other than annoying to the Plaintiff. *Lunsford v. Bennett*, 17 F.3d 1574, 1580 (7th Cir. 1994) (affirming summary judgment for prison officials who allegedly subjected prisoners to loud noises over an intercom during a 24-hour period; "[t]he record contains no evidence that the noise levels posed a serious risk of injury to the plaintiffs. Subjecting a prisoner to a few hours of periodic loud noises that merely annoy, rather than injure the prisoner does not demonstrate a disregard for the prisoner's welfare"); *Murphy v. Dowd*, 975 F.2d 435, 437 (8th Cir. 1992) ( per curiam ) (affirming judgment for prison officials, finding excessive noise claim was meritless); *Givens v. Jones*, 900 F.2d 1229, 1234 (8th Cir. 1990) (affirming summary judgment for prison officials in suit

ORDER - 31

alleging excessive noise caused by remodeling in prison; court finds noise is "a fact of life" and that the claim "on its face appears almost specious"; inmate failed to claim the noise was result of malicious intent or even reckless disregard for his well-being); *Wilson v. Seiter*, 893 F.2d 861, 867 (6th Cir. 1990) (affirming summary judgment for prison officials in suit where inmates complained of excessive noise levels; defendants' uncontradicted affidavits were not sufficiently countered by plaintiffs to show that defendants were violating Eighth Amendment; "at best, [the inmates'] claim evidences negligence ... in implementing standards for maintaining conditions"); *Peterkin v. Jeffes*, 855 F.2d 1021, 1027 (3d Cir. 1988) ("the noise in the cells, while it may be irritating to some prisoners, cannot fairly be said to inflict cruel and unusual punishment").

c. *Cell Temperature*

Plaintiff claims the Defendants "purposely shut down my cell's ventilation" and kept the cell block's door open, causing him to "spend a winter fully dressed shivering under my blankets trying to use my own breathe [sic] as a heater." Ct. Rec. 48 at 42.   In the Supplement, he claims the temperature was "at near freezing" for the whole winter and sometimes the water in his toilet would freeze around the edges. Ct. Rec. 68 at ¶ 33.

Prisoners are entitled to "the minimal civilized measure of life's necessities." *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997) (*citing Farmer v. Brennan*, 511 U.S. 825, 833-34, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). This includes a right to protection from extreme cold. *See id.* (holding that cell so cold that ice formed on walls and stayed throughout winter every winter might violate Eighth Amendment).  "[C]ourts should examine several factors in assessing claims based on low cell temperature, such as the severity of the cold; its duration; whether the prisoner has alternative means to protect himself from the cold; the adequacy of such alternatives; as well as whether he must endure other uncomfortable conditions as well as cold." *Dixon*, 114 F.3d at 644.

Turning to this case, there is no evidence as to how cold it was inside Plaintiff's cell, or how long he had to live in cold temperatures, other than his allegation it was "a winter". The evidence of record shows that individual cells did not have their own

ORDER - 32

ventilation, heating and cooling system. The temperature for the entire jail was operated by a central control room and maintained between 72 and 78 degrees.  Although Plaintiff complains his vent door was left open, this fact would suggest he was receiving the flow of air controlled by the ventilation system.  The cellblock exterior doors were operated by the control room.   It would have violated jail policy for an exterior door to have been left open.   The jail provided inmates with double blankets in the winter.  Thus, Plaintiff had a way of combating the purported cold cell temperatures.  Plaintiff has produced no evidence on how he was harmed by the purportedly cold temperatures.  This factual context makes Plaintiff's claim that Defendants allowed a cellblock door to be open an entire winter in order to freeze the Plaintiff implausible.  Plaintiff's failure to come forward with any persuasive evidence which would support an inference that the temperatures either caused him harm or were intended to punish, entitles Defendants to summary judgment.

### d. Inadequate Winter Clothing

The Amended Complaint also states that Plaintiff was "placed" in outdoor recreation during the winter months without warm clothing.  Ct. Rec. 48 at ¶ 39.  Plaintiff claims that the denial of warm clothing is tantamount to refusing to provide outdoor exercise.  It is undisputed that inmates at the TFCJ were issued jumpsuits and underwear, and that no inmates at the TFCJ, other than inmate workers, were issued additional clothing, such as coats, gloves, or hats for winter time recreation.

Adequate clothing is one of life's necessities that prisons officials can not deny an inmate. *Helling v. McKinney*, 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 198-99, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); *Hoptowit v. Ray*, 682 F.2d 1237, 1258 (9th Cir. 1982). "The denial of adequate clothing can inflict pain under the Eighth Amendment." *Walker v. Sumner*, 14 F.3d 1415, 1421 (9th Cir. 1994) (inmate who alleged he did not receive a jacket and his own boots when he returned to prison did not show a triable issue of fact because he did not describe the footwear he had received, did "not allege that the

ORDER - 33

weather conditions were such that the deprivation of a jacket inflicted pain of a constitutional magnitude," and did not describe the clothing that he did have).

A constitutional violation is more apt when inmates are denied clothing in extreme weather conditions. *See, e.g., Palmer v. Johnson*, 193 F.3d 346 (5th Cir. 1999) (inmate was forced to overnight outdoor confinement having to withstand strong winds and cold without the protection of jackets or blankets, and claimed that he and others were reduced to digging in the dirt to construct earthen walls as feeble wind barriers; court found that, although the degree to which the temperature actually fell was relevant to a conclusive determination, the inmate's exposure to the elements arising out of this incident could have risen to the level of a constitutional deprivation; accordingly, the court denied the defendants' motion for summary judgment on the basis of qualified immunity and remanded the cause for further proceedings); *Mitchell v. Maynard*, 80 F.3d 1433, 34 Fed. R. Serv. 3d 1018 (10th Cir. 1996) (material issue of fact precluded summary judgment regarding Eighth Amendment violation where inmate alleged that officials failed to provide him with adequate clothing); *Gordon v. Faber*, 973 F.2d 686 (8th Cir. 1992) (unconstitutional to require inmates to stay outdoors for 1 - 1 3/4 hours in freezing weather for shakedown search without proper clothing); *Davidson v. Coughlin*, 920 F. Supp. 305 (N.D. N.Y. 1996) (material issue of fact precluded summary judgment where inmate alleged that prison officials denied inmate winter underwear, socks, sweater, boots, and gloves during harsh winter season); *Davidson v. Scully*, 914 F. Supp. 1011 (S.D. N.Y. 1996) (material issue of fact precluded summary judgment where inmate alleged that prison officials failed to provide warm outdoor clothing in violation of Eighth Amendment); *Knop v. Johnson*, 977 F.2d 996, 1012 (6th Cir. 1992)(affirming the district courts decision that inmates exposed to harsh winter conditions without proper winter clothing  may suffer from infliction of pain that are without penological justification in violation of the eighth amendment), cert. denied, 507 U.S. 973, 113 S.Ct. 1415, 122 L.Ed.2d 786 (1993); *Balla v. Idaho State Bd. of Corrections*, 595 F. Supp. 1558, 1575 (D. Idaho 1984) (prison officials violated the Constitution when they

provided inmates with clothing that was "patently insufficient to protect [them] from the cold in the winter months").

Defendants have presented weather data for the Twin Falls area showing that temperatures during the winter of 2005 ranged from high temperatures of 25 (in January 2005) to 58 degrees Fahrenheit (in March 2005). Ct. Rec. 118, Ex. A. Though Defendants contend winters there are "relatively moderate," the court agrees with the opinion of the Idaho court in *Balla* that a jumpsuit alone is insufficient to withstand outdoor recreation on the coldest of Idaho winter days. But the critical facts distinguishing this case from those where a constitutional violation was potentially found is that Plaintiff a) was not required to go outside during harsh conditions and b) was not unable to exercise. The record shows inmates had the choice of exercising inside or outside during their one-hour per day, five day a week regimen of recreation time. Based on the evidence before the court, a reasonable jury could not conclude that any of the Defendants forced Plaintiff to go outdoors in extreme cold or that the denial of cold-weather clothing in the circumstances to the extent presented here was a deprivation of constitutional magnitude.

### e. Lack of Sanitary Conditions

Plaintiff claims that cell 905 had feces smeared on the wall. Ct. Rec. 48 at ¶ 25. Plaintiff claims that his cellmates would throw human waste "everywhere" and the defendants would "leave these messes for up to a week at a time causing unsanitary living conditions." Ct. Rec. 48 at ¶ 45. Defendants do not dispute that inmates would occasionally throw human waste while housed in the 900 block, however, inmate cells were inspected every morning and they claim inmates received cleaning supplies every day.

Filthy conditions can infringe on an inmates basic human need for sanitary living conditions. The court notes Plaintiff makes no claim that any serious health threat arose from the unpleasant condition, nor were the acts of the Plaintiff's cellmate in the control of the Defendants. In addition, Plaintiff has not disputed that cleaning supplies were

1  provided. Although the condition of feces "all over the place" and "liv[ing] in it" is not

2  pleasant, these general statements with no other factual support or context do not

3  establish or allege facts indicating that the condition was sufficiently serious to amount

4  to a constitutional violation. *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir.1988)

5  (depriving prisoner of toilet paper, soap, toothpaste and toothbrush while keeping him in

6  filthy, roach-infested cell for a period of several days was not a constitutional violation);

7  *Morissette v. Peters*, 45 F.3d 1119, 1122-23, n. 6 (7th Cir.1995) (plaintiff's "filthy" cell

8  and inadequate cleaning supplies did not violate Eighth Amendment).

9      f. *Food*

10     Plaintiff claims that between October 2004 and December 2004 he was served

11 tainted food on four occasions, in retaliation for his calling Defendant Guest names. In

12 retaliation for his complaints regarding the tainted food and his "extreme illness,"

13 Plaintiff alleges he was then deprived of food on four occasions, twice for three days,

14 once for four days, and once for five days. He claims the tainted food made him ill, and

15 his requests for medical attention were denied. As a result of the deprivation of food he

16 claims he lost 60 pounds.

17     With respect to meals, "[t]he Eighth Amendment requires only that prisoners

18 receive food that is adequate to maintain health; it need not be tasty or aesthetically

19 pleasing." *LeMaire v. Maas*, 12 F.3d 1444, 1456 (9th Cir.1993); *see Frost*, 152 F.3d at

20 1128 (applying Eighth Amendment standard to a pretrial detainee's Fourteenth

21 Amendment claims regarding his conditions of confinement). " 'The fact that the food

22 occasionally contains foreign objects or sometimes is served cold, while unpleasant, does

23 not amount to a constitutional deprivation.' " *LeMaire*, 12 F.3d at 1456 (citations

24 omitted). In order to violate the Eighth Amendment, deprivations must be "unquestioned

25 and serious" and contrary to "the minimal civilized measure of life's necessities." *Rhodes*

26 *v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). The withholding

27 of food is not "a per se objective violation of the Constitution; instead, a court must

28 assess the amount and duration of the deprivation." *Reed v. McBride*, 178 F.3d 849, 853

ORDER - 36

1
2
3
4
5
6
7
8
9
10
11
12

(7th Cir.1999); *Talib v. Gilley*, 138 F.3d 211, 214 n. 3 (5th Cir.1998) ( "The deprivation of food constitutes cruel and unusual punishment only if it denies a prisoner the 'minimal civilized measure of life's necessities.'") (citations omitted). The Court of Appeals for the Seventh Circuit has held that an inmate who alleged that prison officials withheld food from him on many occasions for three to five days at a time stated a claim under the Eighth Amendment. *Reed*, 178 F.3d at 853-54. The Court of Appeals for the Eighth Circuit concluded that denying an inmate food for 32 hours was objectively serious enough to violate the Eighth Amendment. *See Simmons v. Cook*, 154 F.3d 805, 808 (8th Cir.1998). However, other courts have noted that not every denial of food violates the Constitution. *See Talib*, 138 F.3d at 214, n. 3 (noting it was doubtful inmate "was denied anything close to a minimal measure of life's necessities" when he was denied fifty meals in five months).

13
14
15
16
17
18
19
20
21
22
23
24

  While Plaintiff's allegations pertaining to food would be sufficient to withstand a motion to dismiss, the summary judgment record demonstrates there is no justification for a jury trial of the claim. There is no evidence Plaintiff received medical care for an alleged food borne illness. The jail contracted with a third-party vendor to prepare all of the food trays supplied to inmates. No Defendant recalls Plaintiff ever complaining about the food quality or quantity, and Defendants deny the allegations of tainting the food or denying him food. If Plaintiff were denied food, he could have used a call box in his cell to request food or filed a grievance. There is no documentation of the alleged weight loss. His TFCJ booking report lists Plaintiff's weight as 200 pounds. When Plaintiff was transferred from the TFCJ to the State Penitentiary he weighed 185 pounds. Finally, Plaintiff himself has failed to come forward with any specific details of the incidents.

25
26
27
28

  Plaintiff's allegations are facially unlikely. However, occasionally, something stranger than fiction turns out to be truth. The courts are entitled, however, to require evidence - and the stranger the claim - the more credible the evidence should be to substantiate it. Here there is no evidence to substantiate Plaintiff's claims, and therefore

1    there is no reason for a jury trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50,

2    106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

3         g. *Grievance System*

4         An inmate has no free-standing constitutional right to a grievance process. In

5    *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir.1988), the Ninth Circuit held that a prisoner

6    does not have a protected liberty interest in prison grievance procedures. Accordingly,

7    Plaintiff's allegations that his grievances were improperly handled or processed do not

8    state a claim and will be dismissed.

9         h. *Medical Care*

10        Pretrial detainees have a right to adequate medical care under the Fourteenth

11   Amendment. *Carnell v. Grimm*, 74 F.3d 977, 979 (9th Cir. 1996). The Ninth Circuit has

12   made clear that, with respect to medical needs, "the due process clause imposes, at a

13   minimum, the same duty the Eighth Amendment imposes: 'persons in custody ha[ve] the

14   established right to not have officials remain deliberately indifferent to their serious

15   medical needs.'" *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002)

16   (citing *Carnell*, 74 F.3d at 979).  A medical need is deemed serious if the failure to treat

17   the condition could result in further significant injury or the "unnecessary and wanton

18   infliction of pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir.1992) (citing

19   *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). In order to

20   establish deliberate indifference, a plaintiff must show a purposeful act or failure to act

21   on the part of prison officials. *McGuckin*, 974 F.2d at 1060.  When a defendant is

22   actually aware of a substantial risk of serious harm, deliberate indifference may be

23   reflected through either action or inaction such as denial, delay, or intentional

24   interference with medical treatment. *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir.

25   2002). However, a delay in receiving treatment, alone and without any harm, will not

26   support a claim. *McGuckin*, 974 F.2d at 1060.

27        Plaintiff claims that on or about September 6, 2004 he was stabbed "twice through

28   [his] right hand." Ct. Rec. 48 at ¶ 15.  Plaintiff claims "I showed Defendant Carlson

ORDER - 38

1

[two] stabb [sic] wounds on my right hand and requested...to get medical care for the

2   wounds." Ct. Rec. 48 at ¶ 117.  He claims he asked Carlson "over and over for two or

3   three days verbally and by written requests." *Id*. at p 117.  In the Supplement he claims

4   he filed grievances to the "administrations officers" about his medical care, but none

5   were ever answered.

6          Plaintiff claims that on September 20, 2004, Defendant Shaffer just laughed when

7   he passed by "soaked with blood" while walking through the door that she was holding

8   open. Ct. Rec. 48 at ¶ 94.  It is undisputed, however, that minutes later Plaintiff was

9   discovered in his cell with blood coming from a cut on his head and he received medical

10  treatment, including stitches at the hospital.  Plaintiff claims that after returning from the

11  hospital he was "denied any and all of the 'doctor prescribed' medical treatments" (other

12  than removal of his stitches), "such as pain relievers, anti-inflam[ma]tories, ice packs,

13  bandage changes and even a sanitary inviorment [sic]."  Ct. Rec. 48 at ¶¶ 22, 25.

14         In the Supplement to his Complaint, Plaintiff also claims that in March 2004 he

15  began filing kites to see a doctor for migraines and anxiety disorder.  But despite "daily

16  kites" he was not permitted to see a doctor, and the nurse he did see didn't help him or

17  allow him even a tylenol or aspirin.

18         The court has reviewed these allegations, as well as the evidence provided by

19  Defendant of Plaintiff's medical treatment while at the TFCJ, and taking the record as a

20  whole, and in the light most favorable to the Plaintiff, Plaintiff's submissions lack

21  particularity sufficient to preclude summary judgment.  For example, Plaintiff vaguely

22  claims he had an "illness" after being fed tainted food and that he was stabbed in the

23  hand twice, but nowhere does the record set out what his injury or medical need was.

24  Plaintiff's summary judgment materials provide no further detail than that provided in the

25  vague recounting in the Amended Complaint (and Supplement thereto), and from this

26  evidence, there are insufficient facts to support a finding that any of the Defendants

27  deliberately ignored a *serious* medical need.  Plaintiff is required on summary judgment

28  to make a showing that there is some likelihood that he could prevail on his claim that

ORDER - 39

Defendants were aware of some serious medical need and failed to take reasonable measures to address those needs.  To do this, Plaintiff must do more than submit a stack of documents that he believes supports his claim. He must detail facts, identifying with particularity the evidence showing he is entitled to relief.   On the record before the court, no reasonable jury could find in Plaintiff's favor on his claim regarding medical attention.

I. *Cell Assignments / Classification*

The Amended Complaint also claims Plaintiff was "thrown into 'the Hole' or segregation with no 'due process'" in retaliation for requesting to make a telephone call to an attorney. Ct. Rec. 48.  In the Supplement to the Amended Complaint, Plaintiff asserts he received no "notice, no charges, no hearing and *not even a verbal reason* as to why I was in 'the hole' and left there for more than (400) four hundred days..." Ct. 68 at 26.  Plaintiff has also pointed out that on April 22, 2004, his classification was "medium," (Ct. Rec. 146, Ex. 1000-I) but by September 21, 2004, Plaintiff's classification had been changed to "high." Plaintiff has cited to provisions of the TFCJ policies including one which mandates that the status of inmates in segregation be reviewed after seven days and then every thirty days, and another which states that "[a]t no time will an inmate's classification be changed to a more restrictive status without the inmate being informed of the reasons for the change and the inmate's rights to a due process hearing regarding the change in custody status" (Ct. Rec. 146, Ex. 1000-H). Plaintiff claims that at no time was he ever afforded a hearing regarding his change in classification or placement in segregation.  There is no information in the record regarding any ongoing administrative review of Plaintiff's status.

Plaintiff's claims raise two separate issues. First, whether Defendants deprived him of substantive due process by placing and keeping him in segregation for thirteen months; and second, whether the Defendant's change in his classification and placement in segregation without a hearing deprived him of procedural due process.

Placement of a detainee in administrative segregation does not automatically

ORDER - 40

trigger due process protection. *Hewitt v. Helms*, 459 U.S. 460, 468, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). There is no substantive due process right to avoid administrative segregation. Even if a restriction or condition may be viewed as having a punitive effect on the pretrial detainee, it is nonetheless constitutional if it also furthers some legitimate governmental objective such as addressing a specific institutional violation and is not excessive in light of the seriousness of the violation. *Bell*, 441 U.S. at 538-39, 99 S.Ct. at 1873-74; *Youngberg v. Romeo*, 457 U.S. 307, 320, 102 S.Ct. 2452, 2460, 73 L.Ed.2d 28 (1982) (requiring that restrictions on the liberty of an involuntarily confined mental patient be reasonably related to legitimate government interests in imposing those restrictions). Among the legitimate objectives recognized by the Supreme Court are ensuring a detainee's presence at trial and maintaining safety, internal order, and security within the institution. *Bell*, 441 U.S. at 540, 99 S.Ct. at 1874.

Plaintiff's broad claim that his placement in segregation constituted punishment is conclusory and based primarily on the undisputed fact that conditions in administrative segregation and the 900 cellblock were more restrictive than other cellblocks at the TFCJ. As described by Defendants, Plaintiff was designated an administrative segregation inmate because 1) he did not qualify for low security classification because he was booked on first degree murder charges; 2) Defendants believed that Plaintiff posed a potential escape risk (even though Plaintiff fervently denies that he actually was); and 3) he was involved in altercations with unidentified general population inmates and had himself indicated he did not want to placed back in the 200 cellblock due to the risk of violence from fellow inmates. These facts alone overwhelmingly support the jail's decision to designate Plaintiff as an administrative segregation inmate. This evidence shows his placement in segregation was reasonably related to the jail's legitimate interests in maintaining both the Plaintiff's and the jail's security, reasonably attempting to protect Plaintiff from aggression of other inmates from the other cellblocks (which were permitted to intermingle at recreation and other activities), and deterring violence within the walls of the jail.

ORDER - 41

Moreover, the restrictions contested by Plaintiff here, including being housed with violent or disciplinary offenders, being housed in a video surveillance cell at times, and being confined to his cell for more extensive time periods because inmates in the 900 cellblock could not co-mingle, appear reasonably related to the legitimate purpose of maintaining security, safety, and order, and do not appear to significantly exceed the inherent discomforts of confinement. *See, e.g., Frost*, 152 F.3d at 1130 (rejecting pretrial detainee's claim that he was improperly classified as a close custody inmate in light of deference to be accorded to prison officials in adopting policies and practices needed to preserve internal order, discipline, and security)

Even if the court were to conclude Defendants conduct qualified as punishment by constitutional standards, however, the Defendants would be entitled to qualified immunity. As a general rule, government officials performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). On the other hand, when the law is clearly established at a level of sufficient specificity, a government official may not rely on qualified immunity. It does not appear that the time the Defendants maintained Plaintiff in segregation was not sufficiently related to the legitimate governmental objective of protecting the security of the inmates and maintaining good order and discipline within the detention facility, or that it was excessive in light of that objective. Keeping in mind that the court must accord the decisions of prison officials in this regard a great deal of latitude, it cannot be said that a reasonable person would have considered the decision to segregate Plaintiff to be unnecessary. Nor, on this record, is there evidence that the Defendant officials should have been aware that their action constituted deliberate indifference to a substantial risk to Plaintiff's safety.

As to Plaintiff's procedural due process claim, because Plaintiff's segregation was not imposed as discipline and did not amount to punishment according to constitutional

ORDER - 42

standards, he did not have a constitutional right to a hearing. *See Mitchell v. Dupnik*, 75 F.3d 517, 524 (9th Cir.1996)(a pretrial detainee who is placed in disciplinary segregation as punishment has a right to a due process hearing). Moreover, though it is possible for prison regulations to give rise to protected liberty interests, the prison policies cited by Plaintiff do not. *Smith v. Sumner*, 994 F.2d 1401 (9th Cir. 1993).

   j. *Time Out of Cell*

   Plaintiff claims that while housed in the 900 cellblock he was "denied recreation many times for weeks on end." (Ct. Rec. 48 at ¶ 38). Plaintiff also claims that Defendant Stringer refused him his "(1) hour a day out of cell time at least (150) times" (Ct. Rec. 48 at ¶ 67). Notably, Plaintiff does not claim that he was confined to his cell 24-hours a day. The only additional information in the record on this claim is in the Supplement to the Amended Complaint where Plaintiff mentions that he "usually" did not get his one hour out a day. Ct. Rec. 68 at 26.

   It is undisputed that during Plaintiff's detention, recreation time was required five times a week, for one hour per time. This regimen was adopted by the Twin Falls County Jail. It is undisputed that "only in extreme circumstances would recreation not be offered five (5) times per week, such as if a cell block was undergoing maintenance." Ct. Rec. 124 [*Hughes* Affidavit] at ¶ 16. Defendants deny having denied him recreation.

   The Fourteenth Amendment requires that pre-trial detainees not be denied adequate opportunities for exercise without legitimate governmental objective. *Pierce v. County of Orange*, 526 F.3d 1190 (9th Cir. 2008). Multiple court decisions have held that detainees are ordinarily entitled to daily exercise, or five to seven hours of exercise per week, outside their cells. *Id.* at 1212 (citing cases).

   Plaintiff does not state he was denied the ability to exercise. Plaintiff's vague allegation of being denied recreation for an unknown number of "weeks" is insufficient to withstand Defendants' motion for summary judgment because there is no evidence that his conditions significantly exceeded, or were independent of, the inherent discomforts of confinement. *See e.g., Pierce v. County of Orange*, 526 F.3d 1190 (9th Cir.

ORDER - 43

1    2008)(providing the equivalent of slightly less than thirteen minutes of exercise a day

2    does not give meaningful protection to this basic human necessity); *Thomas v. Ramos*,

3    130 F.3d 754, 763 (7th Cir. 1997) (holding that lack of exercise may rise to an Eighth

4    Amendment violation in limited circumstances where movement is denied, muscles are

5    allowed to atrophy and the inmate's health is threatened); *Antonelli v. Sheahan*, 81 F.3d

6    1422, 1432 (7th Cir. 1996)(holding that "[l]ack of exercise may rise to a constitutional

7    violation in extreme and prolonged situations where movement is denied to the point that

8    the inmate's health is threatened" (inmate denied recreation for periods of up to seven

9    weeks in succession)); *Keenan v. Hall*, 83 F.3d 1083, 1089-91 (9th Cir. 1996)(holding

10   that denial of all out-of-cell exercise time and denial of personal hygiene items states a

11   constitutional violation); *Anderson v. Romero*, 72 F.3d 518, 527 (7th Cir. 1995)

12   (identifying the denial of all opportunity for out-of-cell exercise as a possible Eighth

13   Amendment violation).

14          Plaintiff's claim premised on the allegation that Defendant Stringer denied him

15   time "out of cell time 150 times" also fails because Plaintiff has failed to set forth any

16   evidence to prove he was harmed by the alleged denials or that such denials, if they

17   occurred, were not reasonably related to a legitimate governmental objective.

18   Importantly, Plaintiff does not allege he was never allowed "out of cell time," and he

19   does not deny that, at times, his out of cell time was simply delayed.  In the 900

20   cellblock, because inmates were not allowed to co-mingle, "out of cell time," other than

21   recreation, was for legitimate reason, restricted.  Defendant Stringer admits that a request

22   for out of cell time could have been denied if another inmate was using out of cell time,

23   or when maintenance or medical personnel were in the cellblock.  Defendant Stringer

24   specifically recalls restricting Plaintiff's time "on occasion" and ordering Plaintiff back in

25   his cell for trying to attract the attention of female inmates.  Ct. Rec. 116 [*Stringer*

26   *Affidavit*] at ¶ 20.  Plaintiff's out of cell claim shall be dismissed.

27          k. *Verbal Harassment*

28          As outlined in the factual recitation above, Plaintiff has alleged that various

ORDER - 44

Defendants made numerous vulgar, unprofessional and inappropriate remarks toward him.   Plaintiff does not allege any physical contact along with the alleged remarks. Despite being deplorable conduct, if such acts occurred, Plaintiff's allegations are insufficient to state a Fourteenth Amendment violation.   Similarly, *verbal* harassment, abuse, and threats (including those sexual in nature), without more, are not sufficient to state a Fourteenth Amendment constitutional deprivation under § 1983. *See Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987) (allegations that correctional counselor told plaintiff that he would transfer him to a higher custody status unit if he tried to go to the law library and that he would be sorry if he filed a class action suit were not actionable under § 1983); *Freeman v. Arpaio*, 125 F.3d 732 (9th Cir. 1997) (abusive language directed at prisoner's religious background and ethnic background not actionable), *abrogated on other grounds by Shakur v. Schriro*, 514 F.3d 878 (9th Cir. 2008). *See also Patton v. Przybylski*, 822 F.2d 697, 700 (7th Cir. 1987) (use of derogatory racial epithets does not violate Fourteenth Amendment).

**2. Failure to Protect from Other Inmates**

   a. *Assaults*

   Jail officials are required to take reasonable measures to guarantee the safety of inmates and officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v.. Brennan*, 511 U.S. 825, 832-33 (1994) (convicted prisoners); *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir.1998) (pretrial detainees). To establish a violation, an inmate must allege facts supporting that he was incarcerated under conditions posing a substantial risk of harm and that prison officials were "deliberately indifferent" to the inmate's safety. *Farmer*, 511 U.S. at 834; Frost, 152 F.3d at 1128; *Redman v. County of Los Angeles*, 942 F.2d 1435, 1443 (9th Cir.1991) (en banc). To demonstrate deliberate indifference, a prisoner must allege facts that an official knew of and disregarded an excessive risk to inmate safety; that is, the official must both have been aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that the official drew the inference. *Farmer*, 511 U.S. at 837;

ORDER - 45

1

*Frost*, 152 F.3d at 1128; *Redman*, 942 F.2d at 1442.

2        Plaintiff alleges while incarcerated at the TFCJ he was assaulted numerous (at

3  least 18) times in numerous different cellblocks by other unnamed inmates. Plaintiff

4  claims the first assaults started on March 5, 2004 in cellblock 200, where he claims

5  inmates beat him up for three days, and for that reason, he was then moved on March 8,

6  2004 to cell block 1300. Jail records also indicate altercations on or about July 6, 2004

7  and July 20, 2004, and a fight on July 30, 2004, all in the 600 cellblock. Plaintiff claims

8  that on September 7, 2004, he was stabbed twice in the hand within 20 minutes of being

9  moved back into the 200 cellblock. Plaintiff claims that on September 20, 2004, inmates

10  ganged up on him at recreation and kicked, beat, stomped on and stabbed him. No dates

11  or details are provided for the alleged other dozen assaults.

12        Plaintiff claims his cell moves violated his right to personal safety because these

13  moves (or the failure to move him) caused him to be assaulted. He specifically claims

14  that Defendant Stringer participated in a "conspiracy to commit murder" by telling

15  inmates in the 100 and 200 block that Plaintiff had been "giving information to the

16  authorities." Ct. Rec. 48 at ¶ 59. Plaintiff claims unnamed inmates told him this as they

17  attacked him. *Id.* at ¶ 61.

18        Assuming Plaintiff's claim that he was assaulted 18 times in the 20 months he was

19  at TFCJ is true, there are no facts in the record from which a fact finder could discern the

20  Defendants were aware of any specific safety threat Carr faced during his detention.

21  There is no evidence Carr ever informed jail officers of a specific threat to his life or of

22  assaults or threats thereof. In fact, the record shows the opposite was true and that Carr

23  desired to disguise any threats. The day Carr claims he was attacked and most severely

24  hurt, with cuts above his left eye and on the back of his head, Carr claimed simply that

25  he had fallen in the recreation room and did not tell jail officers the details about the

26  alleged beating he now claims he sustained outside. The next day, after he told the

27  officer he did not think it would be good for him to go back to cellblock 200, he was

28  moved to the only protective custody cellblock, 900, where he remained for the duration

ORDER - 46

of his stay.  Because interaction with other inmates was restricted in the 900 cellblock, it was also, undisputedly, the safest for Plaintiff.

Plaintiff has failed to elaborate at all on the alleged 18 attacks, to identify inmates having harmed him, or to identify any injuries suffered other than on two occasions. No evidence exists of Plaintiff complaining of assaults when they allegedly occurred.  There is no evidence which would provide any basis for a fact finder to find Defendants disregarded a <u>known</u> risk to the security of Plaintiff.  Instead, viewing the facts in the light most favorable to Plaintiff only demonstrates the unfortunate realities of jail and prison life that detainees are often subject to, absent fault on the part of individual jail guards. Prisons are dangerous places. Some inmates get there by violent acts such as murder and some prisoners have a propensity to commit more such acts. Liability of a jail officer for failure to protect an inmate only materializes if the officer knew the inmate faced a risk of harm and disregarded that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 847, 114 S.Ct. 1970. There is no genuine issue of material fact concerning the assaults Plaintiff now claims he suffered because there is no evidence demonstrating that any of the named officers knew about threats to Carr's safety or disregarded that risk.

b. *Cellmates*

Plaintiff claims that while housed in the 900 block's only two-man cell, Defendant Adams housed Plaintiff with "mentally ill inmates" who would scream, curse, kick their doors and throw human waste everywhere.  Ct. Rec. 48 ¶ 44, ¶ 47, ¶ 109. He specifically cites having to share a cell with Wayne Dine (from December 3 to December 15, 2004), who "mostly stayed naked and threw and smeared his poop everywhere" with the intention of causing Plaintiff pain and for their "sick entertainment." Ct. Rec. 48 at ¶ 48. He claims the noise from the mentally ill inmates caused him headaches. Ct. Rec. 48 at ¶ 46.

Although undoubtedly unpleasant and uncomfortable, Plaintiff's allegations regarding cellmates do not state a viable constitutional claim as Plaintiff's allegations of

ORDER - 47

harm are not of such duration or sufficiently serious to rise to a constitutional level of "significantly exceed[ing]...the inherent discomforts of confinement." *See e.g., Redman v. County of San Diego*, 942 F.2d 1435, 1442-43 (9th Cir.1991) (en banc) (eighteen-year-old, 130-pound pretrial detainee with no prior convictions was placed in an enclosed cell with a twentyseven-year-old, 165-pound inmate incarcerated for violating parole upon conviction for a sex offense and identified as an "aggressive homosexual," and the pretrial detainee was raped).

### 3. Access to Courts and to Counsel

Defendants have also moved for summary judgment on Plaintiff's access to courts claims. Plaintiff's access to courts claims are comprised of nearly all general categories of types of alleged interference: interference with communications (mail, telephone and in-person) with legal personnel, interference with inmate's own preparation of his case (including access to legal materials), and punishment or transfer to prevent or discourage exercise of access to courts.

Plaintiff's access to courts claims are premised upon the allegations he was: 1) denied access to the law library, 2) assigned to a video surveillance cell so he "couldn't fight [his] case" (Ct. Rec. 48 at ¶ 68), 3) that his journal with evidence of names and dates of wrongdoing was confiscated by Defendant Adams, 4) that he was unable to privately correspond with counsel due to the fact that phone lines were monitored, that attorney visits could be monitored or overheard, that his ability to call his attorney was limited by his placement in segregation, 5) that to contact his public defender he had to use a non-private jail form, and 6) that the inability to make non-collect calls severely restricted communication with attorneys, who refused to accept such calls. He also alleges Defendant Stringer and Shaffer opened, read, copied, stole and/or discarded his mail (including "legal mail") outside his presence. Ct. Rec. 48 at ¶ 72. He claims Defendant Shaffer purposely held up his habeas corpus petition by a few days and also refused to file a civil rights claim and a second withdrawal of guilty plea with the courts. Defendants deny ever delaying or refusing to file any document.

ORDER - 48

1

Prisoners, including pretrial detainees, "have a constitutional right of access to the courts," *Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *accord Lewis v. Casey*, 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), grounded, as relevant to prisoners, in the constitutional guarantees of equal protection and due process, *see, e.g., Murray v. Giarratano*, 492 U.S. 1, 11 n. 6, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989) ("The prisoner's right of access has been described as a consequence of the right to due process of law, and as an aspect of equal protection." (internal citations omitted)); *see also Christopher v. Harbury*, 536 U.S. 403, 415 n. 12, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) (observing that, in various civil and criminal cases, the Supreme Court has grounded the right of access to the courts in the Privileges and Immunities Clause of Article IV, the Petition Clause of the First Amendment, the Due Process Clauses of the Fifth and Fourteenth Amendments, and the Equal Protection Clause of the Fourteenth Amendment). The Supreme Court explained in *Bounds* that this right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds*, 430 U.S. at 828, 97 S.Ct. 1491. But the Supreme Court has likewise instructed that " *Bounds* did not create an abstract, freestanding right to a law library or legal assistance." *Lewis*, 518 U.S. at 351, 116 S.Ct. 2174. Instead, "[t]he right that Bounds acknowledged was the (already well-established) right of access to the courts," *Lewis*, 518 U.S. at 350, 116 S.Ct. 2174; *see also id.* at 351, 116 S.Ct. 2174 (" '[M]eaningful access to the courts is the touchstone.' " (quoting *Bounds*, 430 U.S. at 823, 97 S.Ct. 1491)). The point is to provide prisoners with the tools they "need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." *Id.* at 355, 116 S.Ct. 2174; see also *Bounds*, 430 U.S. at 825, 97 S.Ct. 1491 (stating that the relevant inquiry is whether the inmate has "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts").

An inmate alleging a denial of his right of access to the courts must show actual

injury, and "an inmate cannot establish relevant actual injury simply by establishing the prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey*, 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). "Conclusory allegations of injury in this respect will not suffice." *Wardell v. Duncan*, 470 F.3d 954, 959 (10th Cir.2006)(citing *Cosco v. Uphoff*, 195 F.3d 1221, 1224 (10th Cir.1999)).   An "actual injury" is " 'actual prejudice with respect to contemplated or existing litigation,  such as the inability to meet a filing deadline or to present a claim.'" *Lewis*, 518 U.S. at 348.   The right of access to the courts "guarantees no particular methodology but rather the conferral of a capability-the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts." *Id.* at 356.

In *Christopher v. Harbury*, the Supreme Court explained:

> Whether an access claim turns on a litigating opportunity yet to be gained or an opportunity already lost, the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong. However unsettled the basis of the constitutional right of access to courts, our cases rest on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court. We indicated as much in our most recent case on denial of access, Lewis v. Casey, [518 U.S. 343, 353 (1996) ], where we noted that even in forward-looking prisoner class actions to remove roadblocks to future litigation, the named plaintiff must identify a "nonfrivolous," "arguable" underlying claim, ... and we have been given no reason to treat backward-looking access claims any differently in this respect. *It follows that the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint,* just as much as allegations must describe the official acts frustrating the litigation. It follows, too, that when the access claim (like this one) looks backward, the complaint must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought. There is, after all, no point in spending time and money to establish the facts constituting denial of access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element.

536 U.S. at 414-15 (internal citations and quotation marks omitted)(emphasis added).

In accordance with this Supreme Court authority, to prevent summary judgment for Defendants, Plaintiff must present evidence, sufficient to create a genuine issue of material fact, that Defendants by their acts hindered or prevented him from bringing, or caused him to lose, an actionable, non frivolous, claim of this type. *Id.*  The court has carefully considered each of Plaintiff's claims of interference alleged in the Amended

ORDER - 50

Complaint in light most favorable to Plaintiff against the record before it. The court concludes that Plaintiff's access to courts claims necessarily fail because he has failed to establish "actual injury." There is simply no allegation or evidence to support the connection between Defendants' alleged conduct and an inability to pursue a *legitimate* challenge to a conviction, sentence, or prison conditions.

Plaintiff's concerns as to privacy in attorney-client communications implicates the Sixth Amendment right to effect assistance of counsel, i.e., one cannot appropriately prepare for a criminal proceeding if discussions are constrained by fear of eavesdroppers. "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. "[U]nreasonable interference with the accused person's ability to consult counsel is itself an impairment of the right [to the assistance of counsel]." *Benjamin v. Fraser*, 264 F.3d 175, 185 (2d Cir. 2001). An accused person deprived of counsel during the pretrial phase of criminal proceedings is one of the most serious deprivations that can be suffered by a pretrial detainee. Policies that restrict a pretrial detainee's ability to consult with his attorney prior to trial, therefore, directly implicate the detainee's Sixth Amendment right to counsel.

In challenging regulations which adversely affect the Sixth Amendment right to counsel by impeding attorney visitation, a pretrial detainee is not required to demonstrate actual injury. *Id.* "[I]n the context of the right to counsel, unreasonable interference with the accused person's ability to consult counsel is itself an impairment of the right." *Id.* at 185. *See also Maine v. Moulton*, 474 U.S. 159, 170, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985)("to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself); *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir.1989)(when pretrial detainee's interest in effective communication with attorney is inadequately respected during pretrial confinement, the ultimate fairness of eventual trial can be compromised); *Wolfish v. Levi*, 573 F.2d 118, 133 (2d Cir.1978)("[O]ne of the most serious deprivations suffered by a pretrial detainee is the curtailment of his ability to assist in his own defense."). When an institutional

ORDER - 51

restriction is found to infringe on a specific constitutional guarantee, "the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security[,]" to determine whether the restriction violates the Constitution. *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

In evaluating whether, as a pretrial detainee, Plaintiff's right to counsel was impaired, a court must determine whether the restrictions imposed unjustifiably obstructed the right of access to counsel or to the courts "in the light of the central objective of prison administration, safeguarding institutional security." *Id.* Plaintiff has not claimed that he was denied all access to his attorneys, only that he was bothered by the capability of the jail to monitor conversations through the use of intercoms, video cameras and other recording or listening devices. The jail's policy of taping outgoing calls is common and serves important penological interests of deterring inmates from using telephone in furtherance of criminal activity inside and outside jail, and detecting, preventing, and prosecuting such activity when it occurred. Plaintiff had other avenues for confidential communication with counsel in writing or with in-person conferences at jail. The court recognizes that Plaintiff alleges that nothing in writing, including his legal mail, was confidential because jail officials opened and had the capability of reading it outside his presence, but he still had the opportunity to arrange face to face meetings. Plaintiff's allegations fail to assert an *unreasonable* interference with this right of access to counsel. In addition, Plaintiff has failed to allege any facts which establish that any of the jail policies or conduct of the defendants resulted in any specific harm relating to his right to communicate with his attorney. *United States v. Hernandez*, 937 F.2d 1490, 1493 (9th Cir.1991) ("[T]he Supreme Court has twice held that government invasion of [the attorney-client privilege] ... is not sufficient by itself to cause a Sixth Amendment violation. The defendant must have been prejudiced by some actions. Our circuit has also explicitly held that prejudice is required.") Since Plaintiff has not alleged how he was prejudiced as a result of the alleged monitoring of telephone calls, attorney visits, and legal mail, Plaintiff has not stated a constitutional violation.

ORDER - 52

One could construe Plaintiff's Amended Complaint as alleging the prejudice or injury in his access to courts claim was that he was forced to plead guilty. Plaintiff has also alleged other conduct was intended to coerce him into pleading guilty, including statements made by ceratin Defendants. *See e.g.*, Ct. Rec. 48 [Amended Complaint] at ¶ 65 ("Plead guilty and you can get out of here"); ¶ 66 ("That statement shows intent to force a guilty plea"); ¶ 72 ("No one can help you Carr"); ¶ 73 ("you should quit lying Carr, you don't even lie good"), ¶ 75 ("Carr with your charges we can do what ever we want to you"); ¶ 101 ("Give up and Plead Guilty"). Expanding on these claims in the Supplement to the Amended Complaint and in the summary judgment briefing, he also claims that he was denied food from June 18 until he was "physically forced...to plead guilty" on June 24th, 2005. Ct. Rec. 139 at 15.

However, this is not an injury for the purposes of section 1983. Nonetheless, in this case, Plaintiff cannot complain of an injury based on inadequate legal resources because he was represented when he pled guilty and during the change of plea colloquy denied his plea was the result any wrongdoing. Of greater import, because a favorable verdict as to any of Plaintiff's claims of official oppression and forced guilty plea would call into question the validity of his conviction, they are barred by *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).

**E. Right to Privacy and Deprivation of Property**

Plaintiff makes several claims which implicate a claimed right to privacy. First he asserts that female correctional officers had the ability to watch him shower or undress. Ct. Rec. 48 at ¶ 68. It is clearly established that the Fourteenth Amendment protects a sphere of privacy, and the most "basic subject of privacy ... the naked body." *Grummett v. Rushen*, 779 F.2d 491, 494 (9th Cir.1985). While the circumstances of institutional life demand that privacy be limited, it is clearly established that *gratuitous* invasions of privacy violate the Fourteenth Amendment. *See id*. The Ninth Circuit has expressly held, however, that occasional viewing of unclothed male prisoners by female correctional officers does not violate the Fourth or Fourteenth Amendment right to privacy. *Somers v.*

ORDER - 53

*Thurman*, 109 F.3d 614, 620 (9th Cir.1997) (concluding that occasional viewing of unclothed male prisoners by female correctional officers does not violate the Fourth Amendment right to privacy); *Grummett v. Rushen*, 779 F.2d 491, 494 (9th Cir.1985) (upholding female guards' restricted observation of male prisoners for the purpose of maintaining prison security).  Plaintiff's allegation that Defendant had the *ability* to watch him when he was undressed does not state a violation of the Fourteenth Amendment.

Plaintiff also claims the Defendants would search his jail cell and "find evidence I gathered against them or journals containing names, dates, and causes of action of the alleged violations and would confiscate the evidence."  He specifies that it was Defendant Adams who stole his journal.  Ct. Rec. 48 at ¶ 68.  Although there is no contention in the Amended Complaint that the cell searches themselves were unreasonable, the court notes that as an incarcerated pretrial detainee Plaintiff's right to privacy in his prison cell is diminished.  *Hudson v. Palmer*, 468 U.S. 517, 524 n. 6 (1984) (citing Bell v. Wolfish, 441 U.S. 520, 556-57, 560-61 (1979) (searches of pretrial detainees' cells did not violate the Fourth Amendment and did not constitute punishment violative of the Due Process Clause)).

In regards to his claim that jail officials stole or removed his personal property during a search of his cell, these allegations state a claim that officials deprived Plaintiff of property without due process of law in violation of the Fourteenth Amendment. However, deprivations of property caused by the misconduct of state officials do not infringe constitutional due process provided that adequate state post-deprivation remedies exist. *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).  Idaho has adopted the Idaho Tort Claims Act, I.C. § 6-901, et seq. , to provide a remedy for citizens injured by the tortious acts of governmental entities, officials and employees. Because the Idaho Tort Claims Act provides a method whereby plaintiffs can obtain redress for personal property deprivation, these claims are not of a constitutional magnitude and cannot be heard in federal court.

ORDER - 54

**F.  First Amendment Retaliation**

Plaintiff's Amended Complaint also alleges Defendants retaliated against him. He states that when he would "complain to family, jail staff or legal counsel about the violations the defendants would retaliate against me by depriving me of basic human needs such as food, toilet paper, phone use, showers, mail, church and many other acts of punishment." Ct. Rec. 48 at ¶ 55. He also claims that his placement in segregation, and cell transfers, were retaliatory.

It is well established that the First Amendment protects prisoners from retaliation for engaging in protected speech, including submitting grievances regarding prison conditions.  Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal. *Rhodes v. Robinson*, 408 F.3d 559, (9th Cir 2005).

Plaintiff's vague and conclusory retaliation claims do not suffice to survive Defendants' summary judgment motion.  Moreover, Plaintiff has not raised a triable issue contradicting that his transfer to administrative segregation or other cells advanced the facility's legitimate penological interest in maintaining order and security. *See Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir.1994) (per curiam) (preserving institutional order, discipline, and security are legitimate penological goals).

**G.    Additional Claims**

Plaintiff's Supplement to the Amended Complaint raises various generalized claims which lack any material facts supporting them.  These include allegations of perjury and fraud in the summary judgment pleadings, conspiracy, breaking his property, searching his cell all the time, refusing to photograph him, refusing to send legal mail in a sealed envelope, providing false information to his lawyer, accusations of perjury and fraud in the summary judgment pleadings, generalized complaints of failure of the

defendants to write incident reports, and unspecified deprivations of toilet paper, phone, shower, mail, church, commissary, N.A., and A.A. These claims, and any others not otherwise specifically addressed herein, are dismissed as vague, conclusory and unsupported by material facts.

**H. Supervisor Liability**

Plaintiff has sued supervisory personnel Defendants, Wright, Byers, Hughes and Sheriff Tousley, in their individual capacities claiming they are liable for the alleged constitutional violations committed by other prison officers.  Under Section 1983, a supervisor is personally liable for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (internal punctuation, quotation marks, and citations omitted); *Chew v. Gates*, 27 F.3d 1432, 1446 (9th Cir. 1994). Specifically, Plaintiff must show, "1) [the supervisor's] personal involvement in the constitutional deprivation, or 2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Redmond v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (citations omitted). Conversely, supervisors cannot be held liable on any theory of vicarious liability under Section 1983. *Hansen v. Black*, 885 F.2d 642 645-46 (9th Cir. 1989). Therefore, supervisors are only potentially liable for their individual actions. *Id.*

Plaintiff has alleged the supervisory Defendants failed to adequately train staff and failed to provide adequate supervision. Ct. Rec. 48 at ¶ 5-6.  However, Plaintiff has put forth no evidence from which it could be inferred that the Defendants were deliberately indifferent, thus his supervisory claim necessarily fails. *Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002) (a plaintiff must allege facts showing that "in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policy-makers...can reasonably be said to have been deliberately indifferent to the

ORDER - 56

1    need.").

2    **I. Official Capacity Claim**

3          In his Supplement to the Amended Complaint, Plaintiff expands beyond the

4    Amended Complaint claiming that various policies of the TFCJ led to the violation of his

5    constitutional rights. Ct. Rec 68 at ¶¶ 5-7, 9-15, 30.  Plaintiff's allegations against

6    Sheriff Tousley as to policies is an official capacity claim under Section 1983, which

7    would impose liability against the entity that Tousley represents, Twin Falls County

8    (who is not a named Defendant). *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 98 S.Ct.

9    2018, 56 L.Ed.2d 611 (1979) (addressing a constitutional challenge to a statute enacted

10   by the city which indisputably was an official policy of the defendant municipality.)

11   The court addresses this allegation briefly.  A claim against a county is sustainable only

12   where a constitutional violation has been committed pursuant to an official custom,

13   policy, or practice.  Although Plaintiff claims that the county's policies were violated in

14   numerous ways, he does not allege that any of the policies are themselves

15   unconstitutional.  Even if Plaintiff's claims could be construed as challenging the

16   constitutionality of the policies in place, none of the policies identified by Plaintiff in the

17   Supplement are constitutionally deficient.  Absent a constitutional violation, there is no

18   basis for holding the County liable in this action under *Monell* for the Defendants'

19   conduct. *Cf. City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89

20   L.Ed.2d 806 (1986) (per curiam) (explaining that neither Monell "nor any other of our

21   cases authorizes the award of damages against a municipal corporation based on the

22   actions of one of its officers when...the officer inflicted no constitutional harm"); *Long v.*

23   *City and County of Honolulu*, 511 F.3d 901, 905, 907 (9th Cir. 2007) (affirming

24   summary judgment in favor of a city on claims of failure to train, failure to supervise,

25   and failure to render medical aid where there was no violation of the plaintiff's rights and

26   no evidence that individual officers acted pursuant to a city policy or custom), cert.

27   denied, --- U.S. ----, 129 S.Ct. 62, 172 L.Ed.2d 25 (2008); *Jackson*, 268 F.3d at 653-654

28   ("Neither a municipality nor a supervisor...can be held liable under § 1983 where no

ORDER - 57

injury or constitutional violation has occurred."); *Scott v. Heinrich*, 39 F.3d 912, 916 (9th Cir.1994) ("While the liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights."), *cert. denied*, 515 U.S. 1159, 115 S.Ct. 2612, 132 L.Ed.2d 855 (1995).

**J. Qualified Immunity**

Defendants have also argued that summary judgment should be granted because they are entitled to qualified immunity. The court did address qualified immunity in the context of Plaintiff's claims regarding the deprivation of food.  As to the remainder of the claims, the court's determination that Plaintiff's claims fail on the merits renders moot whether the Defendants are entitled to qualified immunity.

**V. CONCLUSION**

This case serves as yet another example of the great burden that is placed on the courts and the fair administration of justice when a plaintiff, under the protective guise of notice pleading, chooses to plead with volume rather than precision.   Plaintiff has made numerous general, vague, conclusory, and in some instances, implausible allegations, in the hopes that something will stick when the court combs through them.  Such cluttered tactics has required the court and the litigants to endure the costs and delays in resolution.   In the end, no one "wins."

The court has spent long hours reviewing and analyzing the claims and the record, despite the brevity of some of the court's analysis because of the sheer number of claims. It is prudent to point out here that there is no obligation on the court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon a constitutional claimant  to formulate arguments and to specifically outline the facts which relate to the claimed constitutional violations. Plaintiff's voluminous shotgun assertions and his summary judgment evidence which adds little to nothing in terms of detail regarding his constitutional claims, cannot withstand summary judgment.

Because Defendants have presented ample affirmative evidence negating an

ORDER - 58

essential element of every single one of Plaintiff's constitutional claims, Plaintiff, as the nonmoving party, "must do more than simply deny the veracity of everything offered." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To have avoided summary judgment, Plaintiff must have "set forth specific facts showing that there is a *genuine* issue for trial." Fed.R.Civ.P. 56(e). Plaintiff has failed to do so. *See Ivey v. Board of Regents*, 673 F.2d 266, 268 (9th Cir.1984)(conclusory allegations without more are insufficient to support a § 1983 claim or withstand summary judgment).

For the reasons set forth above, the court **GRANTS** Defendants' motions for summary judgment (**Ct. Recs. 108, 109, 110, 111, 112, 113, 114, 115**) and dismisses all of Plaintiff's claims against all the remaining Defendants set forth in the Amended Complaint with prejudice.  Defendants' motions to strike (Ct. Recs 158 and 159) are **DENIED**. As stated, *supra*, at Section V. A. hereof, this ruling avoids any factual or evidentiary hearings required for a determination as to whether the Plaintiff exhausted his administrative remedies on his innumerable claims.  Without ruling, the record suggests that Plaintiff has failed to comply with this requirement.

The District Court Executive is directed to enter this order, enter **JUDGMENT** dismissing the First Amended Complaint and the claims therein against all Defendants with prejudice, and close this file.

**IT IS SO ORDERED.**

Dated this 27th day of May, 2009.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE

ORDER - 59